**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 5, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MIRIAM LEVERINGTON,

     Plaintiff - Appellant,

v.

CITY OF COLORADO SPRINGS, doing
business as MEMORIAL HEALTH
SYSTEM, and DUAINE PETERS, in his
individual capacity,

     Defendants - Appellees.

No. 09-1550

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:09-CV-01999-RPM)

---

Ian D. Kalmanowitz of Cornish & Dell'Olio, Colorado Springs, Colorado, for Plaintiff-
Appellant.

Tracy Lessig, Senior City Attorney for the City of Colorado Springs (Patricia K. Kelly,
City Attorney, with her on the brief), Colorado Springs, Colorado, for Defendants-
Appellees.

---

Before **HARTZ, TACHA,** and **EBEL,** Circuit Judges.

**EBEL**, Circuit Judge.

For over a year, Plaintiff-Appellant Miriam Leverington worked as a cardiac nurse for the internal staffing agency of Memorial Health System ("Memorial"), which is an enterprise of the City of Colorado Springs (the "City"). However, Ms. Leverington was fired from her position after she told Colorado Springs Police Officer Duaine Peters, during a "less than cordial" traffic stop, that she hoped she never had him as a patient. Peters informed Leverington's superiors about her statement, and Memorial terminated her employment.

Leverington sued Peters and the City, doing business as Memorial, under 42 U.S.C. § 1983, alleging that the defendants violated her First Amendment right of free speech. The defendants filed a motion to dismiss under Rule 12(b)(6), which the district court granted. For the reasons discussed below, we affirm.

## BACKGROUND[1]

From November 14, 2007, to December 23, 2008, Ms. Leverington worked as a cardiac nurse for "M-Staff," Memorial's internal staffing agency. On December, 17,

---

[1] Because this is an appeal from the district court's dismissal of Leverington's complaint under Rule 12(b)(6), the court assumes the truth of Leverington's allegations, and draws all reasonable inferences in her favor. See Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1178 (10th Cir. 2009).

2008, Ms. Leverington was pulled over by Officer Peters at or near the North Nevada Avenue Exit off of Interstate 25 in Colorado Springs. Peters wrote Ms. Leverington a ticket for speeding, and during the traffic stop "their conversation became less than cordial." (Aplt. App'x at 5, ¶¶ 13, 15.) After Peters gave Ms. Leverington the ticket, she "told him that she hoped she never had him as a patient." (Id. at 5, ¶ 16.) Peters replied, "I hope not too, because maybe I'll call your supervisor and tell her you threatened me." (Id. at 5, ¶ 18.) After Ms. Leverington stated to Peters that she was not threatening him, Peters told Ms. Leverington not to make comments like that, "because I don't appreciate it whatsoever, and that is very, very unprofessional on your part. I will be calling your supervisor." (Id. at 5, ¶¶ 19-20.)

Within five days after that conversation, Peters contacted Ms. Leverington's supervisors at M-Staff and informed them that he had been threatened by Ms. Leverington. On December 22, 2008, Carlene Crall, Memorial's Chief Human Resources Officer, "emailed Jonathan Liepe with M-Staff and Terry Huskins with Human Resources and instructed them to terminate Ms. Leverington's employment." (Id. at 5-6, ¶ 22.) Mr. Liepe called Ms. Leverington the next day and told her that "her employment was terminated immediately because she had threatened a police officer." (Id. at 6, ¶ 23.)

On August 21, 2009, Ms. Leverington filed a complaint against Peters and the City, doing business as Memorial, alleging causes of action under 42 U.S.C. § 1983 for violation of Ms. Leverington's free-speech rights under the First Amendment. On

3

October 21, 2009, defendants filed a motion to dismiss Ms. Leverington's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They alleged that the complaint failed to state a claim against either defendant and that Peters was entitled to qualified immunity. The district court granted the defendants' motion and entered judgment on November 12, 2009, concluding that "[t]here is no authority to support a claim that such a single statement in that context can be considered protected speech."[2] (Id. at 63.)

## DISCUSSION

### I.      Standard of Review

"We review de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). We assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." Dias, 567 F.3d at 1178 (citation omitted). "In First Amendment cases, we have an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Thomas v. City of Blanchard, 548 F.3d 1317, 1322 (10th Cir. 2008) (internal quotation marks omitted).

---

[2] The district court did not reach the qualified-immunity issue.

4

However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," and a complaint that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. Twombly, 550 U.S. at 555.

## II.     Ms. Leverington's Claim Against Memorial[3]

At the heart of Ms. Leverington's claim against Memorial is her contention that Memorial violated her rights of free speech under the First Amendment when it fired her for telling Officer Peters "that she hoped she never had him as a patient." (Aplt. App'x at 5, ¶ 16.) As discussed below, while Ms. Leverington certainly has free speech rights even as a public employee, in this case Memorial did not overstep its bounds in taking action against her for her statement to Peters.

"[A] public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140 (1983). "Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."

---

[3] Although Ms. Leverington is suing the City, doing business as Memorial, the allegations in her complaint are directed specifically against Memorial.

Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  However, the interests of public employees in commenting on matters of public concern must be balanced with the employer's interests "in promoting the efficiency of the public services it performs through its employees."  Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); see also Garcetti, 547 U.S. at 420 ("The Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions.").

The Court in Pickering sought to achieve this balance through the adoption of a four-part test to be implemented in public-employee, free-speech cases.  See, e.g., Kent v. Martin, 252 F.3d 1141, 1143 (10th Cir. 2001) (describing Pickering test).  In Garcetti, the court expanded on the Pickering test by adding a fifth, threshold inquiry that seeks to determine whether the speech at issue was made pursuant to the public employee's official duties.  Garcetti, 547 U.S. at 421; see also Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1202 n.4 (10th Cir. 2007) ("Garcetti made clear that the first step is to determine whether the employee speaks pursuant to his official duties.").  Thus, after Garcetti, "it is apparent that the 'Pickering' analysis of freedom of speech retaliation claims is a five step inquiry which we now refer to as the 'Garcetti/Pickering' analysis."  Brammer-Hoelter, 492 F.3d at 1202; see also Couch v. Bd. of Trs. of the Mem'l Hosp., 587 F.3d 1223, 1235 (10th Cir. 2009) ("When analyzing a free speech

6

claim based on retaliation by an employer, this court applies the five-prong

Garcetti/Pickering test.").

The Garcetti/Pickering test thus includes the following inquiries:

(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

Dixon v. Kirkpatrick, 553 F.3d 1294, 1302 (10th Cir. 2009).

Ms. Leverington argues that the second prong of this test—whether her speech was on a matter of public concern—should not be applied to her claim against Memorial. As discussed below, this argument is without merit. The test applies and, indeed, is dispositive in this case, because even drawing all reasonable inferences in Ms. Leverington's favor, it is clear that she was not speaking on a matter of public concern when she made her statement to Peters.

**A.      The "Public-Concern" Test Applies to Ms. Leverington's Claim Against Memorial.**

Ms. Leverington argues that the "public-concern" test should not apply to her claim against Memorial because "when a public employee engages in protected speech which occurs off duty and is unrelated to the employer's internal functioning, a straightforward Pickering balancing test is applied, without application of the typical public concern prong as a predicate to first amendment protection." (Aplt. Br. at 23.) In

7

support, Ms. Leverington cites Flanagan v. Munger, 890 F.2d 1557, 1562-63 (10th Cir. 1989); United States v. National Treasury Employees Union ("NTEU"), 513 U.S. 454, 480 (1995) (O'Connor, J., concurring); and Bonds v. Milwaukee County, 207 F.3d 969, 976 (7th Cir. 2000). None of these authorities support Ms. Leverington's contention.

In Flanagan, several Colorado Springs police officers sued the police chief and city, alleging that their First Amendment rights were violated when they were issued reprimands for owning a video store that rented X-rated films. 890 F.2d at 1560-61. In considering the plaintiffs' appeal from an adverse summary judgment ruling, we found that "it is nearly impossible to logically apply the public concern test to the present case in which an employee engages in nonverbal protected expression neither at work nor about work." Id. at 1562. We reached this conclusion for several reasons.

First, we noted that the language of the public-concern test itself indicated that it was inapplicable to the situation before the Court: "It is difficult to comprehend how each of the officer's owning of a one-quarter interest in a video store which rents a small portion of sexually explicit videos is making a 'comment' on any subject, especially a subject of public concern." Id. at 1563.[4]

Second, we found that "[t]he specificity of precedential language in our circuit further indicates that the public concern test was not intended to apply to situations of this

---

[4] Tellingly, in Flanagan we contrasted that situation with a situation in which officers made off-duty statements about the desirability of pornographic films, which we concluded would almost surely pass the public-concern test. Flanagan, 890 F.2d at 1563.

8

type." Id. By declaring that "'what is <u>actually said</u> on [a] topic is the crux of the public concern content inquiry,'" and that First Amendment protection is limited to "statements made by public employees which 'sufficiently inform [an] issue' of public concern," our prior cases seemed to us "to require that something actually be said on the topic," and rendered application of the public-concern test difficult to apply in that case because there was no traditional speech. Id. (second alteration in original) (quoting <u>Wren v. Spurlock</u>, 798 F.2d 1313, 1317 n.1 (10th Cir. 1986), <u>cert. denied</u>, 479 U.S. 1085 (1987), and <u>Wilson v. City of Littleton</u>, 732 F.2d 765, 768 (10th Cir. 1984)).

Third, we found that application of the public-concern test to speech that occurred at work or about a work-related subject "makes sense" because the test "helps define public concern in an area in which the critical distinction should be whether the speech at issue takes on significance outside the workplace or whether it deals primarily with an employee's personal employment problem." Id. at 1564. However, we found that in a case involving "nonverbal protected expression not at or about the workplace, the 'speech' already takes place outside of the workplace and thus the purpose behind using the public concern test is simply irrelevant." Id.

Finally, we determined that the public-concern test "implies that the test is not intended to apply to areas in which the employee does not speak at work or about work," because the test "is intended to weed out speech by an employee speaking <u>as</u> an employee upon matters only of personal interest." Id.

9

Based on the incompatibility of the public-concern test in that case, we thus concluded that "the public concern test does not apply when public employee nonverbal protected expression does not occur at work and is not about work." Id. In the case now before us, however, Ms. Leverington's statement was clearly verbal expression, it related to her work, and it potentially had an impact upon her employer. Unlike the difficulty in Flanagan in determining what "comment" was being made by ownership in a video store that rented sexually explicit videos, here we have no difficulty in evaluating Ms. Leverington's statement. Finally, as we discuss more fully below, Ms. Leverington's speech was speech "as an employee upon matters only of personal interest." Id. Her statement on its face indicated that her personal animus toward Peters could impact any possible future interaction with him that she might have as a nurse at Memorial. This is precisely the kind of speech that that public-concern requirement is designed to "weed out." Id. Thus, our pronouncement in Flanagan does not apply to Ms. Leverington's claim.

Ms. Leverington's reliance on Justice O'Connor's concurring opinion in NTEU is also misplaced. In NTEU, the Supreme Court held that an honoraria ban prohibiting federal employees from accepting compensation for making speeches or writing articles, even when the subject of the speech or article does not have any connection with the employee's official duties, was unconstitutional under the First Amendment. 513 U.S. at 457. Nowhere in NTEU did the Court hold that the public-concern test does not apply; in fact, the Court applied the public-concern test to the claims at issue. Id. at 466. The

10

comments by Justice O'Connor in her concurring opinion that Ms. Leverington refers to are a bit difficult to understand, but Justice O'Connor clearly did not intend to abrogate the public-concern test in this context because she immediately cites and quotes Connick. Id. at 480 (O'Connor, J., concurring). Justice O'Connor observed that the plaintiffs in NTEU were only challenging the ban as it applied to "off-hour speech bearing no nexus to Government employment." Id. (O'Connor, J., concurring). By contrast, here Ms. Leverington's speech directly made a nexus between her animus toward Peters and her employment as a nurse at Memorial.

Finally, Ms. Leverington relies on the statement by the Seventh Circuit in Bonds that "[s]peech by government employees, completely divorced from the employment context, is protected under the same standard as speech by those who are not government employees." 207 F.3d at 976. In making this statement, however, the court was identifying the general distinction between regulation of speech by the government acting as the government, on one hand, and regulation of speech by the government acting as an employer, on the other. The very next sentences in the opinion illustrate this distinction: "The government qua employer, however, may apply legitimate employment standards in regulating the workplace and promoting efficient operation. This often requires the government to regulate the speech of its employees in a manner that, outside the employer-employee relationship, would violate the First Amendment." Id. at 976-77. This distinction has been recognized since at least Pickering, see Garcetti, 547 U.S. at 417-419 (describing development of public-employee free-speech jurisprudence), and

11

does not compel the conclusion that the public-concern test does not apply to Ms. Leverington's statement. Indeed, the Seventh Circuit in <u>Bonds</u> went on to apply the <u>Pickering</u> test, including the public-concern requirement, to the speech at issue. <u>Bonds</u>, 207 F.3d at 979-81.

In short, Ms. Leverington has failed to identify any authority for the proposition that the public-concern test does not apply to her claim against Memorial. <u>See</u> <u>City of San Diego v. Roe</u>, 543 U.S. 77, 78-79, 82-84 (2004) (applying public-concern test to police officer's sale of sexually explicit videos of himself).

**B.**     **Ms. Leverington's Statement Was Not on a Matter of Public Concern.**

Whether Ms. Leverington's statement was on a matter of public concern is a question of law. <u>Baca v. Sklar</u>, 398 F.3d 1210, 1219 (10th Cir. 2005). "Matters of public concern are those of interest to the community, whether for social, political, or other reasons." <u>Brammer-Hoelter</u>, 492 F.3d at 1205 (internal quotation marks omitted); <u>see also</u> <u>City of San Diego v. Roe</u>, 543 U.S. 77, 83-84 (2004) ("[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." <u>Connick</u>, 461 U.S. at 147-48. Courts "construe 'public concern' very narrowly." <u>Flanagan</u>, 890 F.2d at 1563.

Ms. Leverington argues that her statement that she hoped she never had Peters as a patient was "criticism . . . akin to questioning the integrity of Officer Peters or revealing

the impropriety of a government official." (Aplt. Br. at 31.) Thus, Ms. Leverington concludes, her statement was on a matter of public concern because "[i]t has long been established that members of the public are free to criticize the government, including the police." Id. This argument is unpersuasive.

First, "it is not always enough that the subject matter of a communication be one in which there might be general interest"; rather, "what is actually said on the topic is the crux of the public concern content inquiry." Wren, 798 F.2d at 1317 n.1; see also Wilson, 732 F.2d at 769 ("In order for a public employee's speech to be 'of public concern,' . . . , it is not always enough that its subject matter could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest. What is actually said on that topic must itself be of public concern." (alterations in original) (internal quotation marks and citation omitted)). A statement "does not attain the status of public concern simply because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." Salehpoor v. Shahinpoor, 358 F.3d 782, 788 (10th Cir. 2004) (internal quotation marks omitted); see also Lee v. Nicholl, 197 F.3d 1291, 1295 (10th Cir. 1999) ("[I]t is insufficient that the speech relates generally to a subject matter of public importance.").

Second, "[i]n analyzing whether speech constitutes a matter of public concern, we may focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or merely deals with personal disputes and grievances unrelated to the

13

public's interest." Lighton v. Univ. of Utah, 209 F.3d 1213, 1224 (10th Cir. 2000) (emphasis added).

Here, it is apparent that what Ms. Leverington actually said—that she hoped she never had Peters as a patient—dealt with a personal dispute or grievance with Peters and was not calculated to disclose misconduct. Indeed, Ms. Leverington alleges in her complaint that she "felt that Officer Peters was rude," and that she made the statement "because she hoped to never interact with him again." (Aplt. App'x at 5, ¶¶ 15, 17.) These allegations on their face indicate a personal grievance with Peters.[5]

Because Ms. Leverington's statement as alleged was not on a matter of public concern, the district court properly dismissed her claim against Memorial, and we need not reach the other prongs of the Garcetti/Pickering test. See Brammer-Hoelter, 492 F.3d

---

[5] Ms. Leverington's complaint also alleges that she informed Peters that she was not threatening him. (Aplt. App'x at 5, ¶ 19.) This statement on its face also relates to a personal grievance and is not on a matter of public concern. Even if it were, or even if we were to assume Ms. Leverington made additional statements to Peters that touched upon matters of public concern, the focus of our inquiry must be on the statement that led to the retaliation. See Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998) ("[W]e address whether the statement which motivated the retaliation is one of public concern . . . ." (emphasis added)). In other words, if an employee's statement of personal grievance causes an adverse employment action, the employee cannot claim that the statement satisfies the public-concern test simply because the statement was accompanied by other speech that was on a matter of public concern. Here, Ms. Leverington alleges that Memorial terminated her "for stating to a police officer[,] 'I hope you are not ever my patient,' a statement the police officer considered a threat." (Aplt. App'x at 6, ¶ 24.) Thus, we focus on this statement, and as discussed above, conclude that it unequivocally reflects a personal dispute, not a matter of public concern.

at 1203 ("If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends.").[6]

## III.    Ms. Leverington's Claim Against Officer Peters

### A.    The Proper Test to Apply to Ms. Leverington's Claim Against Peters

Although the Garcetti/Pickering test applies to Ms. Leverington's claim against Memorial, she argues that her claim against Peters instead should be evaluated under the three-part inquiry we set forth in Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000), which applies to "First Amendment retaliation claims against defendants other than the plaintiff's employers." Couch, 587 F.3d at 1238. For the reasons discussed below, we conclude that Ms. Leverington is correct, and that the Worrell test applies to her claim against Peters.

#### 1.    The Worrell test

The framework set forth in Pickering and Garcetti is traditionally applied in free-speech cases in which the public employer is the same individual or entity that takes the adverse action at issue against the employee. See Worrell, 219 F.3d at 1209-10 (noting that "the Pickering balancing has been most frequently applied to adverse actions taken

---

[6] We also do not need to reach the City's argument that Ms. Leverington has failed to state a claim for municipal liability. In any event, that argument was not raised below and Ms. Leverington has not had a fair opportunity to address it, and so we decline to consider it. See Turner v. Pub. Serv. Co., 563 F.3d 1136, 1143 (10th Cir. 2009) ("Absent extraordinary circumstances, we will not consider arguments raised for the first time on appeal.").

by employers—individuals . . . who have the authority to make hiring and firing decisions and take other personnel actions."). The Court in <u>Worrell</u> was presented with a slightly different situation; specifically, a free-speech retaliation claim by a public employee against a third party for allegedly causing the employee-plaintiff's employer to take the adverse action at issue. <u>Id.</u>

The plaintiff in <u>Worrell</u> was a former FBI agent who, in 1986, testified as an expert for the defense in a criminal case involving the killing of an undercover agent for the Oklahoma Bureau of Narcotics and Dangerous Drugs ("OBNDD"). <u>Id.</u> at 1201. This testimony generated considerable anger among OBNDD agents. <u>Id.</u> at 1202. Approximately nine years later, the plaintiff applied for an investigative position with the District Attorney's office for the Twentieth Judicial District of Oklahoma, and was offered a position as coordinator for the District Attorney's drug task force. <u>Id.</u> However, the District Attorney subsequently rescinded the offer after an OBNDD agent, who had previously offered the assistance of the OBNDD to the task force, informed the District Attorney that he did not trust the plaintiff and would not work with him, based partly on the plaintiff's testimony nine years earlier. <u>Id.</u> The District Attorney explained to the plaintiff that he was rescinding the offer because he was concerned that the OBNDD would not cooperate or coordinate with the task force if the plaintiff were hired, and he (the District Attorney) felt that the cooperation and coordination of the OBNDD was essential. <u>Id.</u>

16

The plaintiff sued the District Attorney, the OBNDD agent, and certain of the agent's superiors for violation of the plaintiff's free-speech rights under the First Amendment. Id. at 1203. The court applied the Pickering test to the plaintiff's claims against the District Attorney as the plaintiff's prospective employer, and concluded that the plaintiff could not satisfy the "balancing" prong as a matter of law. Id. at 1207-09. However, with respect to the OBNDD agents, the Court found that there were "serious risks" in applying the Pickering balancing test to retaliation claims against "an official outside the employing agency," because to do so could effectively give such a third party an impermissible veto over the employer's personnel or contractual decisions. Id. at 1210. Specifically, a third party, upon whose cooperation an employer depended, could refuse to cooperate with the employer unless a particular employee was fired, demoted, or transferred. Id. at 1210-11. In this way, the third party could "effectively create the very workplace disruption that, under the Pickering approach, could be used to justify the limitation of First Amendment rights." Id. at 1211.

Instead, the Court set forth a three-part test to be used in free-speech retaliation claims against "a defendant who is not the plaintiff's employer and when there is no contractual relationship between them." Id. at 1212. In order to succeed on such a claim, a plaintiff must prove:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially

17

motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

Id. (internal quotation marks omitted).

> 2. The Worrell test applies to Ms. Leverington's claims against Peters.

As the above discussion makes clear, the Worrell test applies to retaliation claims in which the defendant "is not the plaintiff's employer and when there is no contractual relationship between them." Id.; see also Couch, 587 F.3d at 1238 (citing Worrell as applying "in First Amendment retaliation claims against defendants other than the plaintiff's employers"). Here, Officer Peters is not Ms. Leverington's employer, and there is no contractual relationship between them. Accordingly, Worrell applies to Ms. Leverington's cause of action against Peters.[7]

Peters nonetheless advances two arguments for why the Garcetti/Pickering test should apply to Ms. Leverington's claim against him. First, he argues that "Worrell only applies to claims against officials outside the plaintiff's employing entity," and that he and Ms. Leverington ultimately both work for the same employer, i.e., the City of

---

[7] Indeed, the Garcetti/Pickering test itself suggests that it is inapplicable to claims such as Ms. Leverington's claim against Peters. The fourth and fifth prongs of the test ask "whether the protected speech was a motivating factor in the adverse employment action," and "whether the defendant would have reached the same employment decision in the absence of the protected conduct." Dixon, 553 F.3d at 1302 (emphasis added). Obviously, Peters is not alleged to have made any employment decision; rather, it was Memorial, as Ms. Leverington's employer, that took the adverse employment action. Thus, it would be cumbersome, if not impossible, to apply Garcetti/Pickering to Ms. Leverington's claim against Peters.

18

Colorado Springs. (Aple. Br. at 7.) Second, Peters argues that even if he and Ms. Leverington work for two separate entities, they are so intertwined under the "single-employer test" that the Garcetti/Pickering framework should be applied to Ms. Leverington's claim against him. (Aple. Br. at 12-13 n.6.) Neither of these arguments has merit.

With respect to his first argument that he and Ms. Leverington work for the same legal entity, Peters first contends that under Colorado law, only municipalities, and not their various enterprises or departments, are "bodies politic and corporate" that may sue or be sued. (Id. at 8.) From there, Peters asserts that (1) the City's powers are vested in the City Council ("Council"); (2) Memorial's Board of Trustees (the "Board") is subject to the general supervision and control of the Council in numerous ways; (3) Memorial employees are City employees; (4) the Colorado Springs Police Department (the "CSPD") is a department of the City created by the Council; and (5) the Chief of Police reports to the City Manager, who is appointed by the Council and serves at the Council's pleasure.

Peters maintains that, taken together, these facts show that Memorial and the CSPD are not "legal entities separate from the City," because the Council has "ultimate control and responsibility over decisions made by Memorial and the [CSPD]." (Aple. Br at 12.) In Peters's view, this puts Ms. Leverington's claims in the same category as traditional public-employee free-speech claims.

19

Peters, however, provides no authority for the proposition that <u>Worrell</u> does not apply simply where the plaintiff's and defendant's ultimate governing or parent entity is the same.[8] Indeed, <u>Worrell</u> itself involved such facts. In <u>Worrell</u>, the plaintiff's would-be employer (the District Attorney's office) and the defendant agent's employer (the OBNDD) were both state agencies. <u>See</u> 19 Okla. Stat. § 215.1 (2010) (creating "the office of district attorney in the State of Oklahoma"); 63 Okla. Stat. § 2-102 (2010) (establishing "the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control"). What was significant for the court in <u>Worrell</u>, however, was the fact that the OBNDD agents had no authority to hire the plaintiff or rescind the offer, and thus were "outside the employing agency." 219 F.3d at 1210. The same circumstances are present in this case, as Peters does not claim to have had any authority to make any employment decisions on behalf of Memorial with respect to Ms. Leverington.

Peters's second argument—that the single-employer test dictates the application of the <u>Garcetti/Pickering</u> test—fares no better. The single-employer test looks to "whether

---

[8] Moreover, Peters's argument requires one to connect several layers of governing authority before finding a common denominator between Peters and Ms. Leverington. In essence, Peters posits that he and Ms. Leverington are both employed by the same legal entity—the City—because (1) on the one hand, Leverington works for Memorial, which is run by the Board, which in turn is subject to certain powers of the Council, which in turn exercises power on behalf of the City; and (2) on the other hand, Peters works for the CSPD, which is managed by the Chief of Police, who in turn reports to the City Manager, who in turn serves at the pleasure of the Council, which in turn exercises power on behalf of the City. Peters's argument ignores the relevant inquiry; that is, the extent to which Peters himself had authority over Ms. Leverington's employment situation.

two nominally separate entities should in fact be treated as an integrated enterprise."

Bristol v. Bd. of Cnty. Comm'rs, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc).

"Courts applying the single-employer test generally weigh four factors: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control." Id. at 1220 (internal quotation marks omitted). Although the test has been employed in contexts such as Title VII, see Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1069-70 (10th Cir. 1998) (describing use in Title VII cases), Peters fails to cite any case—and this Court could find none—in which a court has applied the test to a First Amendment free-speech claim.

Instead, Peters's "single-employer test" argument is based entirely on one footnote in Worrell, in which the court acknowledged that "there may be instances in which the operations of a third party agency are so intertwined with the operations of the employing agency that the Pickering balancing should be applied." Worrell, 219 F.3d at 1212 n.3. The Worrell court noted that, "[i]n other contexts, courts have held that one company or agency may be held liable for another company or agency's wrongful conduct if the companies or agencies constitute a 'single employer.'" Id. However, the court expressly declined to decide "whether a 'single employer' approach may be applied such that nonemployer defendants may be afforded the benefit of the Pickering balancing." Id.

Thus, it is far from clear that the single-employer test is appropriate for evaluating the proper framework under which to consider free-speech, public-employee retaliation claims. Indeed, in Sandoval v. Boulder Regional Communications Center, this Court

21

noted that "other courts have been particularly cautious in finding that two nominally separate state or municipal governmental entities are in fact a single employer, since such a conclusion effectively negates what we assume was a state's conscious choice to create distinct organizations." 388 F.3d 1312, 1323 n.3 (10th Cir. 2004). "Absent some indication that the state's decision was motivated by a desire to circumvent the civil rights laws or other laws, principles of comity counsel federal courts not to be too quick to erase organizational dividing lines drawn up by state authorities." Id.

In any event, even assuming that the single-employer test is appropriate to apply in this context, Peters's argument fails. First, he does not separately address any of the factors relevant to a single-employer analysis, but rather asserts that the relationships between the Council, on the one hand, and Memorial and the CSPD, on the other, "clearly establish that the single employer test is met." (Aple. Br at 12-13 n.6.) This analysis misses the mark. The test is whether the operations of Memorial, as the "employing agency," and the CSPD, as "the third party agency," are so intertwined as to constitute a single employer. Worrell, 219 F.3d at 1212 n.3. That the Council retains some measure of authority or control over Memorial and the CSPD individually is insufficient to satisfy the test as contemplated by Worrell.[9]

---

[9] Indeed, it is doubtful that the test even could be met with respect to Memorial and the Council. With respect to the "centralized control of labor relations" factor—which is "the most important" prong of the single-employer analysis, see Sandoval, 388 F.3d at 1322—this Court has found that "[t]he critical question is, 'what entity made the

Continued . . .

In short, there is no basis for applying the Garcetti/Pickering analysis to Ms. Leverington's claims against Peters. Instead, the Worrell test applies.

B.     **Application of the Worrell Test to Ms. Leverington's Claims Against Peters**

Having decided that the Worrell test applies to Ms. Leverington's claim against Peters, it is apparent that her claim was properly dismissed because Peters is entitled to qualified immunity with respect to the first prong of the this test. Specifically, it was not clearly established that Ms. Leverington was engaging in constitutionally protected activity when she made her statement to Peters.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (internal quotation marks omitted). In resolving a motion to dismiss based on qualified immunity, a court must consider "whether the facts

_____

final decisions regarding employment matters related to the person claiming discrimination?'" Frank v. U.S. West, Inc., 3 F.3d 1357, 1363 (10th Cir.1993) (quoting Trevino v. Celanese Corp., 701 F.2d 397, 404 (5th Cir. 1983)). Here, although the Council may have retained some powers over the Board, there is no evidence that the Council made the final decisions with respect to Memorial's employment matters. See Colorado Springs City Code, Ch. 13, Art. 1, § 13.1.104 (providing that subject to the "general supervision and control" of the Council, the Board "shall exercise complete control" over, inter alia, "personnel and employee matters . . . and other policies of Memorial Hospital," and that the Board "shall generally be empowered and authorized to do all things, not in conflict with the City Charter or this Code, for the operation, maintenance and development of Memorial Hospital" (emphasis added)).

23

that a plaintiff has alleged . . . make out a violation of a constitutional right," and "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. at 816 (internal quotation marks omitted). The Supreme Court in Pearson made clear that courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 818.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Thomas v. Durastanti, 607 F.3d 655, 669 (10th Cir. 2010) (internal quotation marks omitted). In this case, it was not clearly established that Ms. Leverington's statement to Peters did not constitute a "true threat" unprotected by the First Amendment. See Nielander v. Bd. of Cnty. Comm'rs, 582 F.3d 1155, 1168 (10th Cir. 2009) (distinguishing between protected speech and "unprotected threats"). In Nielander, we found that because it was debatable whether a reasonable officer would have considered the plaintiff's statement to be a threat, "we cannot say that the applicable law [was] clearly established such that [the defendant] acted unreasonably in writing a probable cause determination." 582 F.3d at 1169. We therefore held that "where a question of ultimate fact (in this case, whether a reasonable officer would be unreasonable in concluding that [a statement] was a true threat under clearly established federal law) cannot be resolved as a matter of law, the law is not clearly established and qualified immunity is appropriate." Id. Here, even drawing all reasonable inferences in

24

favor of Ms. Leverington, it is debatable whether a reasonable officer in Peters's position would have considered her statement to be a threat. Accordingly, Ms. Leverington's free-speech rights in this context were not clearly established, and Peters is entitled to qualified immunity on this basis.

In addition, it was not clearly established that Ms. Leverington's statement was "protected" for another reason—as discussed above, it was not on a matter of public concern. We have stated in the Garcetti/Pickering context that the public-concern test determines whether a government employees speech is "protected." See Dixon, 553 F.3d at 1303-04 (applying public-concern test to determine whether a government employee's speech is "constitutionally protected"); Brammer-Hoelter, 492 F.3d at 1203 ("If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends."); Worrell, 219 F.3d at 1205 (stating, in applying Pickering test, that "only matters of public concern . . . are protected by the First Amendment in this context").

Thus, in order to survive the first prong of Worrell, Ms. Leverington would have to establish that the public-concern test does not apply to a free-speech retaliation claim under Worrell. We have substantial doubt that this is the case. Whether an employer's adverse employment action is permissible depends on whether the employee's speech is on a matter of public concern—if not on a matter of public concern, we deem the employer's action to be permissible under the First Amendment. It would make little sense to punish third parties for "chilling" private speech that does not enjoy protection from the government employer. If the First Amendment does not protect Ms.

25

Leverington against the consequences of her statement (termination by Memorial), then it would be incongruous to nonetheless impute "liability" to Peters.

We note that the Supreme Court in its recent Phelps decision underscored the importance of the public-concern inquiry in determining how much protection is afforded to speech:

> Whether the First Amendment prohibits holding [defendants] liable for [their] speech in this case turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. [S]peech on matters of public concern . . . is at the heart of the First Amendment's protection. The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.
>
> [N]ot all speech is of equal First Amendment importance, however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: [T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import.

Snyder v. Phelps, 131 S. Ct. 1207, 1215-16 (2011) (internal quotation marks and citations omitted).

However, we need not—and do not—decide here whether the public-concern test applies in the context of a Worrell inquiry. It is sufficient that the law was not clearly

26

established on this point, and thus that Peters is entitled to qualified immunity on this basis as well.[10]

## CONCLUSION

For the reasons discussed above, we AFFIRM the district court's order of dismissal under Rule 12(b)(6) and the district court's judgment of November 12, 2009.

---

[10] In addition, it is not clear that Ms. Leverington's complaint satisfies the second, causation prong of Worrell.  In other contexts, where a plaintiff's retaliation claim involves the retaliatory animus of a third party and the action of another, the plaintiff must show a causal connection between the third-party's animus and the action.  Cf. Hartman v. Moore, 547 U.S. 250, 263 (2006); McBeth v. Himes, 598 F.3d 708, 719-20 (10th Cir. 2010).  Arguably, by alleging that Memorial fired her based on objective information that an officer considered her statement to be a threat, Ms. Leverington has failed to allege the requisite causal connection between Peters's retaliatory animus and Memorial's adverse employment action.

It is not clearly established under Worrell whether the causation that Ms. Leverington must prove requires a nexus between Memorial's decision to discharge her and Peters's discriminatory animus or whether it would be sufficient for Ms. Leverington simply to show a nexus between Memorial's decision to discharge her and Peters's act of reporting the alleged threat by Ms. Leverington to Memorial without regard to Peters's state of mind or animus or lack thereof in making that report.  Again, we need not—and here do not—resolve the proper legal standard beyond merely noting that it is an open issue and thus is not clearly established.

09-1550 - *Leverington v. City of Colorado Springs*

**HARTZ**, Circuit Judge, concurring:

I concur in the result and join all but § III(B) of Judge Ebel's opinion. With respect to § III(B), I agree that Officer Peters is entitled to qualified immunity because at the time of the incident the law was not clearly established that the First Amendment prohibited him from retaliating when Ms. Leverington's speech was not on a matter of public concern. I do, however, disagree with the suggestions in the opinion (1) that the First Amendment does not prohibit a police officer from retaliating against a public employee unless that employee's speech was on a matter of public concern, even when it is only fortuitous that the victim of the retaliation is a public employee; and (2) that there was insufficient evidence that Peters's action caused Leverington to lose her job, *see Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) ("[I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm.")