**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 14, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TOM D. TRIMBLE,

    Plaintiff - Appellant,

v.

BOARD OF COUNTY
COMMISSIONERS OF TULSA
COUNTY, OKLAHOMA; KAREN
KEITH; RON PETERS,

    Defendants - Appellees.

No. 17-5058
(D.C. No. 4:16-CV-00263-TCK-FHM)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **HARTZ**, and **McHUGH**, Circuit Judges.
_____

Tom D. Trimble sued the Board of County Commissioners of Tulsa County,

Oklahoma (the Board), and County Commissioners Karen Keith and Ron Peters,

claiming that he was terminated from his position with the County in retaliation for

his speech on matters of public concern, in violation of his First Amendment rights.

The United States District Court for the Northern District of Oklahoma dismissed

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Trimble's complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for relief under 42 U.S.C. § 1983. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

### A. Factual Allegations

Because we are reviewing the dismissal of a complaint, we take as true the well-pleaded allegations in the complaint. *See Leverington v. City of Colo. Springs*, 643 F.3d 719, 723 (10th Cir. 2011).

 Trimble began working for Tulsa County in 1991, ultimately becoming the County's IT Manager in 2003. In 2013 the Tulsa County Sheriff's Office and the County, with input from Trimble's IT Department, decided to hire a new medical provider at the Tulsa County Jail—Armor Correctional Health Services, Inc. The transition to Armor included the installation of a new electronic medical-records system at the Jail.

For reasons that remain unclear to Trimble, he "learned, early on, that he, and the IT Department would not be a part of the records system transition." Aplt. App. at 10. In September 2013, Linda Dorrell, the County's director of purchasing, informed Trimble that Armor would use its own IT staff to begin the records transition and that Undersheriff Tim Albin thought Trimble's involvement was not necessary. Trimble responded, "We'll only need to be involved with the medical system if they intend to connect to the County's network." *Id.* (brackets and internal quotation marks omitted). Trimble later learned that Armor did intend to connect to

2

the County's network, and he became concerned. He thought that "if Armor was to connect to the County's system, without any involvement from the IT Department, it would compromise the safety of County data and systems. Importantly, the confidentiality of inmate medical information could be breached." *Id.* at 10-11.

When the Armor system was set to "go live" on November 1, 2013, Trimble perceived a "crisis situation." *Id.* at 11 (internal quotation marks omitted). He emailed Albin, Dorrell, and defendant Commissioners Keith and Peters, as well as the third Commissioner, John Smaligo:

> My department heard about the new telemedicine contract for the first time less than a month ago. Tim Albin quickly assured Linda Dorrell and I that the chosen company had their own separate system so my department did not need to be involved.
>
> As you probably know, they had a very aggressive project timeline and cut-over to their system yesterday at midnight. They also still went ahead with go-live **knowing they overlooked a fairly important aspect of their job function** that was not known until yesterday.
>
> Per their communications below, they want 12 laptops to reside on Tulsa County's production network that did not get purchased through my office. This is totally different than the understood needs of the project and is in **total conflict with county policy. To protect county-wide operations, I can't allow non-county devices to connect anywhere on our production network. It would put _every_ _department_ in the county _at_ _risk_**.
>
> My immediate recommendation would be that we get a config out today for the remaining ten laptops. Just like you and I discussed the other day, my department really needs to be included from the beginning to avoid these kind of recurring last minute **crisis**. Likewise, I feel **the new company really dropped the ball on this one** and should have been totally upfront with you about their full operational needs.

3

*Id.* (ellipses and internal quotation marks omitted; emphasis added in Mr. Trimble's complaint). After Albin then threatened Trimble and his staff, he sent the following email to Albin:

> Respectfully, my staff was (very) upset yesterday because they were repeatedly told if someone died [at the Jail], we would be held liable. I find this offensive, threatening, and totally inappropriate. ***The true liability rests on the medical company for waiting until the day of go-live to bring up new requirements, and on <u>you</u> for excluding us from a project that clearly involves the use of technology.***
>
> We sincerely want to help you guys and provide the best support possible, but we need to be treated as part of the team and not as last minute emergency responders.

*Id.* at 12 (internal quotation marks omitted; emphasis added in complaint).

As Trimble and the IT Department "went to work to correct the serious deficiencies with Armor's system integration with the County's system," they "encountered additional challenges," *id.*, as recounted in an email from Trimble to Keith:

> You'll probably be getting a call on this from the Sheriff tomorrow and want to be sure you hear the details from both sides.
>
> Approximately two weeks ago, our Help Desk received a call that the jail's training lab was down. When our tech arrived, the new medical company was onsite trying to connect their equipment to our network. Network security blocks non-county hardware from accessing our production environment to protect operations countywide. To resolve their immediate need, we created an isolated training network to keep training on schedule.
>
> Since that time, my department continues to get pulled in as the technical requirements for their system keep changing. This has progressed from an assurance of no involvement at all to spending more than 300 man hours across six staff trying to accommodate their needs. ***This comes at an expense to other county projects that are being forced to wait.***
>
> [A]t 5:38 p.m. last night, we were notified [Armor's] equipment must connect to our production network to function properly. ***They were aware this was not an option. It is a well-known and long-standing policy designed to protect county-wide operations that all equipment attaching***

4

***to our network is required to first go through my department and be
signed off by me before purchase.***

[W]e've been working on any feasible alternative that would not
compromise network stability while addressing this operational need at the
jail. ***Every Office, Division, and supported Agency on our network
depends on my department to maintain the most stable and safe computer
environment possible. To compromise that trust-and expectation is not
something I can do in good conscience.*** An outside vendor's changing
needs certainly don't justify it nor do I feel the Jail Operator has the
authority to require it.

*Id.* at 12-13 (ellipses and internal quotation marks omitted; emphasis added in

complaint).

Over the following months, Trimble "continued to raise serious concerns about

Armor and its medical records system at the Jail." *Id.* at 13. In December 2013 he

emailed Dorrell and the Sheriff's risk manager, Josh Turley:

I'm trying very hard not to let our frustrations interfere with the common
goal, but ***[Armor's] disorganization is flat-out crazy***.

My personal opinion is that our department provided every single thing
specified on the signed agreement before November 1st cut-over. When we
realized that they clearly weren't ready, we are on record that Armor
needed to delay until they had tested all aspects of their required services.
After it went live, they should have been able to clearly articulate exactly
what remained to be done. Even today, that list keeps changing or an item
reappears that we thought was already being handled.

My biggest frustration is the number of staff I've taken away from major
scheduled projects to provide what was specifically asked for and then be
asked that it be done again in a totally different way. Other critical
timelines are being impacted. Other elected officials are getting pissed and
it makes my department look bad.

The legal implications keep getting brought up and I get that. It is almost
analogous to [the Sheriff's Office] responding to a bank robbery and calling
me because I didn't load their bullets. ***Their HIP[AA] data currently not
being encrypted on my network which is a major concern (that one is not
even on your list) [is] yet another screaming reason we need [Armor] on
their own subnet so Tulsa County can steer clear of that liability***

5

***altogether.*** If this were an agreement made through my department, I would have thrown them out immediately.

*Id.* at 13-14 (ellipses and internal quotation marks omitted; emphasis added in complaint). And in early January 2014, Trimble wrote a memo "notif[ying] the [Board] of inadequate funding and staffing of the IT Department and 'new projects' that had overwhelmed the staff." *Id.* at 14.

About this time, Trimble's working conditions began to change. Peters initiated an audit of the IT Department, allegedly targeting Trimble in retaliation for his complaints. After the audit, which Trimble thought was "unfair, factually inaccurate and biased," he was placed on paid administrative leave in April 2014. *Id.* On May 1, 2014, the Board voted 2-1 to terminate Trimble's employment; Peters and Keith voted in favor of termination and Smaligo voted against.

### B.    Court Proceedings

Trimble filed a single claim against Defendants under 42 U.S.C. § 1983, alleging that he was terminated in retaliation for his speech on matters of public concern, in violation of his First Amendment rights. Defendants moved to dismiss the complaint for failure to state a claim. The district court granted the motion, holding that all of Trimble's speech alleged in his complaint was made pursuant to his official duties as the Tulsa County IT Manager and was therefore not protected under the First Amendment. The court further held that amendment of Trimble's complaint would be futile because its deficiencies stemmed from allegations that

6

were inconsistent with a plausible First Amendment retaliation claim rather than insufficient pleading. It therefore dismissed the complaint with prejudice.

## II. Analysis

Trimble argues on appeal that the district court failed to view his allegations in the light most favorable to him and erred in concluding that all of the speech he alleged was made pursuant to his official duties. We are not persuaded.

### A. Standard of Review

We review de novo the district court's dismissal of Trimble's complaint under Rule 12(b)(6). *See Leverington*, 643 F.3d at 723. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (alteration and internal quotation marks omitted).

### B. Trimble's Speech Was Not Protected

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007) (internal quotation marks omitted). But "the First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Id.* (brackets and internal quotation marks omitted). Thus, "when government employees speak on matters of public concern, they must face only those speech restrictions that are

7

necessary for their employers to operate efficiently and effectively." *Id.* (internal quotation marks omitted).

To determine whether a public employer impermissibly retaliated against an employee in violation of the First Amendment, we apply a five-part test derived from the Supreme Court decisions in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Garcetti v. Ceballos*, 547 U.S. 410 (2006).  *See Brammer-Hoelter*, 492 F.3d at 1202 .  We agree with the district court that Trimble's complaint fails the test's initial step, which asks "whether the employee speaks pursuant to his official duties." *Id.* (brackets and internal quotation marks omitted).  If that is the case, "there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* (internal quotation marks omitted). Whether Trimble spoke pursuant to his official duties is a question of law to be determined by the court.  *See Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010).  To answer the question, we consider "all the facts and circumstances surrounding the speech and the employment relationship." *Brammer-Hoelter,* 492 F.3d. at 1204.

> The ultimate question is whether the employee speaks as a citizen or instead as a government employee . . . .  Consequently, if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties.

8

*Id*. at 1203. This court "take[s] a broad view of the meaning of speech that is pursuant to an employee's official duties." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (internal quotation marks omitted).

The district court accurately concluded from the allegations in Trimble's complaint that his job responsibilities included:

- giving input on the decision to replace the Jail's medical provider;
- involvement in integrating Armor's system with the County's network (despite initially being told that the IT Department would not be involved in the transition from the previous medical-records system);
- protection of county-wide operations; and
- approval of purchases of equipment that will be connected to the County's network.

For example, one of Trimble's emails asserted that "[e]very Office, Division, and supported Agency on our network depends on my department to maintain the most stable and safe computer environment possible." Aplt. App. at 13 (emphasis and internal quotation marks omitted). And, as the district court observed, in each of his communications Trimble raised "concerns about the security or stability of the Tulsa County IT network, the role of the IT Department in the implementation of the new medical records system, and/or the impact of Armor's system on the IT Department." *Id.* at 99. In light of Trimble's own allegations regarding his job responsibilities, it cannot be denied that all of his communications referenced in the complaint were made pursuant to his official duties as IT Manager.

Trimble contends that the district court improperly viewed his allegations in the light most favorable to the defendants. He maintains that, properly construed in his favor, his complaint shows that (1) the Board and Sheriff's Office did not view

9

his official duties as encompassing the Jail's medical-records system; (2) he had no employment relationship with Armor, the private contractor responsible for the medical-records system on which he commented, and the Board had no authority over the Jail; and (3) some of his statements were not made within his chain of command. He concludes from these facts that his speech was not "commissioned" by his employer. Aplt. Br. at 10 (internal quotation marks omitted).

But even though the initial view of the Board and Sheriff's Office was that Armor's medical-records system was outside the scope of the IT Department, he became involved *in his capacity as IT Manager* once he learned that the Jail system could affect the County's network. Again, the district court accurately analyzed the complaint:

> Plaintiff's communications beginning on November 1, 2013 show that he viewed the transition – and the aspects that he criticized – as relevant to the security and stability of the Tulsa County network. Further, by Plaintiff's own admission, the medical records transition did affect the IT Department, and Plaintiff and his team ultimately were involved in addressing problems related to Armor's system.

Aplt. App. at 100. Trimble's allegations demonstrated that protection of the County's IT network fell squarely within his official duties, per county policy. *See id.* at 11 ("To protect county-wide operations, I can't allow non-county devices to connect anywhere on our production network. It would put every department in the county at risk." (emphasis and internal quotation marks omitted)); *id.* at 12-13 (invoking a "well-known and long-standing policy designed to protect county-wide operations that all equipment attaching to our network is required to first go through

10

my department and be signed off by me before purchase" (emphasis and internal quotation marks omitted)); *id*. at 13 ("Every Office, Division, and supported Agency on our network depends on my department to maintain the most stable and safe computer environment possible. To compromise that trust-and expectation is not something I can do in good conscience." (emphasis and internal quotation marks omitted)). And his complaint alleged (emphasized really) the extensive work that the IT Department ultimately did, despite being initially excluded from the project, to support the medical-records transition at the Jail. *See id.* at 12 ("[M]y department continues to get pulled in as the technical requirements for [Armor's] system keep changing. This has progressed from an assurance of no involvement at all to spending more than 300 man hours across six staff trying to accommodate their needs." (internal quotation marks omitted)); *id.* at 13 ("[W]e've been working on any feasible alternative that would not compromise network stability while addressing this operational need at the jail." (internal quotation marks omitted)). Indeed, Trimble alleges that his staff devoted so much time to working on the transition that it interfered with their completion of other projects. *See id.* at 12 ("This comes at an expense to other county projects that are being forced to wait." (emphasis and internal quotation marks omitted)); *id.* at 13 ("My biggest frustration is the number of staff I've taken from major scheduled projects . . . . Other critical timelines are being impacted. Other elected officials are getting pissed and it makes my department look bad." (internal quotation marks omitted)).

11

Trimble's lack of an employment relationship with Armor, and the Board's lack of authority over the Jail, do not alter the analysis. It is not at all unusual for a public employee's job to require contact, communication, and coordination with public and private persons outside the employee's agency. For some employees, that may be the heart of their jobs. As Trimble repeatedly emphasized in his communications, his contact with "outsiders" was essential for the proper functioning of his own department.

For the same reason, we reject Trimble's contention that some of his statements were protected speech because he addressed them to Sheriff's Office officials who were not within his chain of command at Tulsa County. The proper focus is not on the recipient of the communication but on whether "the speech stemmed from and was of the type that the employee was paid to do, regardless of the exact role of the individual or entity to which the employee has chosen to speak." *Rohrbough*, 596 F.3d at 747 (brackets, ellipsis, and internal quotation marks omitted). The emails Trimble sent to Sheriff's Office officials were for the purpose of helping him perform his duties as the County IT Manager. He would have been derelict in those duties if he had not complained to those who were impairing the operations of his agency.

To be sure, much, if not all, of what Trimble said may have been protected speech if it had come from another public employee. But these were not communications by a public employee who just happened to notice problems in how the government was functioning. His criticisms of those outside his department were

12

not freestanding citizen complaints but were moored to his own duties. The problems he pointed to were creating problems for him – problems that he had a responsibility to prevent or ameliorate, if not cure. His communications addressed matters committed to his care. *Cf. Thomas*, 548 F.3d at 1324 (building inspector's report of suspected criminal activity to law enforcement "went well beyond his official responsibilities"; "[n]o one could say he was 'commissioned' by the City to report suspected wrongdoing to [law enforcement]"); *Brammer-Hoelter*, 492 F.3d at 1205 (teacher-plaintiffs' speech was protected when they had neither supervisory responsibility nor a duty to report problems that they discussed after work hours with ordinary citizens).

Trimble may have been treated shabbily and contrary to good public policy and proper administrative practices. The only issue before this court, however, is whether his treatment violated his First Amendment rights. Because Trimble's speech, as alleged in his complaint, was pursuant to his official duties as the County's IT Manager, his complaint failed to state a claim of retaliation in violation of the First Amendment.

## III.   Conclusion

The district court's judgment is affirmed.

Entered for the Court

Harris L Hartz
Circuit Judge

13