**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 17, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ELHAM SALEMI,

     Plaintiff - Appellant,

v.

COLORADO PUBLIC EMPLOYEES'
RETIREMENT ASSOCIATION; TIM
MOORE, in his official and individual
capacities; ANGELA SETTER, in her
official and individual capacities,

     Defendants - Appellees.

No. 17-1085
(D.C. No. 1:13-CV-02826-WYD-CBS)
(D. Colorado)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

Elham Salemi brought this action against the Colorado Public Employees'

Retirement Association ("PERA"), and individual employees of PERA, raising

claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§ 1981; the First Amendment, the Family and Medical Leave Act ("FMLA"), and the

Equal Pay Act ("EPA"). The district court granted summary judgment on all of Ms.

Salemi's claims, except the EPA claim as against PERA. The district court also

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

denied Ms. Salemi's requests that the jury be instructed on an EPA retaliation claim, in addition to the EPA wage discrimination claim included in the final pre-trial order. The district court denied the requests, and the jury returned a verdict in favor of PERA on the EPA wage discrimination claim.

On appeal, Ms. Salemi challenges the district court's grant of summary judgment on her (1) Title VII claims for discrimination and retaliation; (2) 42 U.S.C. § 1981 retaliation claim; (3) First Amendment retaliation claim; and (4) FMLA retaliation claim. Ms. Salemi also challenges the district court's denial of her requests to submit an EPA retaliation claim to the jury. We affirm the district court's grant of summary judgment on the claims before us on appeal and conclude that the district court did not abuse its discretion in denying Ms. Salemi's requests to submit an EPA retaliation claim to the jury.

## I.  BACKGROUND

### A.  *Ms. Salemi's Employment at PERA*

### 1.  Overview of Employment History Through January 2011

In 2004, PERA hired Ms. Salemi as a temporary intern in its Alternative Investments ("AI") Division. Ms. Salemi's starting salary was $27,040. Defendant Tim Moore was involved in the hiring process and Chris Reilly served as Ms. Salemi's immediate supervisor. At all times relevant, Jennifer Paquette served as Chief Investment Officer at PERA and was the supervisor for the head of the AI Division.

In September 2004, PERA promoted Ms. Salemi to a permanent Portfolio Associate position, with an annual salary of $50,000. According to Ms. Salemi, in late

2

2006, her then-supervisor, Mr. Reilly, discussed the possibility of promoting her to the position of Analyst. But Mr. Reilly was leaving PERA and Ms. Paquette decided to select a replacement for Mr. Reilly before promoting Ms. Salemi. In February 2007, PERA selected Mr. Moore to head the AI Division, and he assumed a supervisory role over Ms. Salemi. Mr. Moore did not immediately promote Ms. Salemi to the position of Analyst. In January 2008, PERA gave Ms. Salemi a merit-based raise, resulting in an annual salary of $61,166. Six months later, in June 2008, Mr. Moore promoted Ms. Salemi to the position of Analyst, eventually resulting in an annual salary of $80,000 for 2009. As of January 2011, Ms. Salemi remained in an Analyst position as a grade 13P employee, with an annual salary of $90,400. The other Analyst in the AI Division, Dave Saunders, was also a grade 13P employee and had an annual salary of $90,900.

## 2. Ms. Salemi's Performance at PERA & Her Complaints of Discrimination

PERA conducted performance appraisals on a yearly basis. Mr. Reilly served as the appraiser relative to Ms. Salemi's performance in 2005 and 2006, and Mr. Moore served as the appraiser thereafter. Ms. Salemi's appraisers gave her an overall ranking of "fully successful," which equated to a rating of four out of five, for her performance in 2006 through 2011.

Elements of Ms. Salemi's yearly performance appraisals, however, were less favorable and noted a need for her to voice opinions at meetings and to develop communication and interpersonal skills. In the 2006 appraisal, Mr. Reilly identified "communication skills" as a "development focus" and noted that Ms. Salemi had "a slight tendency to hold back her opinions" and "should continue to gain confidence in

3

verbalizing and defending her ideas to the team." App'x at 687, 690. In the 2007

appraisal, Mr. Moore indicated that Ms. Salemi should "take more initiative." *Id.* at

699, 702. And in the 2008 evaluation, Mr. Moore indicated that Ms. Salemi's "focus

in the coming year should be to expand her knowledge base in Alternative

Investments, contribute more to Investment Committee meetings, communicate her

thoughts to the team, [and] continue to develop relationships outside of PERA." *Id.* at

716. Mr. Moore also identified "initiative/action orientation" as a "development

focus," stating that Ms. Salemi "is very responsible in her dailey [sic] duties and in

special requests. I would like to see her be more aggressive in analyzing the

portfolio. She definitely has the skills to analyze the market and our portfolio in ways

that could provide interesting debate within the team." *Id.* at 710–11. Similar

notations about Ms. Salemi's need to take initiative and verbalize her opinions in

meetings can be found in her 2009 and 2010 appraisals.[1]

In March 2011, Ms. Salemi met with Mr. Moore and sought a promotion to the

position of Portfolio Manager. Some of the qualifications for the Portfolio Manager

position, as identified in the job description, included: (1) "[e]valuates, recommends

and makes appropriate investment decisions based on fundamental, quantitative and

economic research and analysis, conducts extensive reference checks and legal and

---

[1] In the 2009 appraisal, Mr. Moore indicated that Ms. Salemi should provide "more input" during meetings and "take more initiative in portfolio analysis." App'x at 722–23. In the 2010 appraisal, Mr. Moore stated, "I will continue to challenge and encourage [Ms. Salemi] to be more vocal and assertive as she has valuable insights and is learning a great deal about this business." *Id.* at 740.

business negotiations"; (2) "[e]nsures compliance with investment agreements, analyzes partnership agreements, and coordinates activity with investment counsel"; and (3) "[m]aintains relationship base with current and potential investment partners and peer groups by serving on advisory committees." *Id.* at 668. The job description also indicated that the position required: (1) "[k]nowledge of financial and capital markets, concepts, principles, and theories"; (2) "[a]bility to understand, interpret and analyze balance sheets, income statements and cash flow statements"; and (3) "[s]trong oral and written communication skills." *Id.*

Mr. Moore rejected the idea of promoting Ms. Salemi on the grounds that Ms. Salemi lacked the necessary communication skills and was not sufficiently assertive or confrontational to serve as a Portfolio Manager.[2] Mr. Moore further opined that Ms. Salemi had not improved her communication skills, had not become more involved in team meetings, and had not taken advantage of mentoring opportunities. According to Ms. Salemi, Mr. Moore indicated that she "was not confrontational and it was not [her] forte to be on a portfolio manager track." *Id.* at 612.

---

[2] As early as December 2009, Mr. Moore concluded that Ms. Salemi's long-term potential at PERA was at her "[p]resent position or equivalent" rather than "[o]ne level higher." App'x at 728. Mr. Moore described an individual capable of being a Portfolio Manager as "[u]nafraid to question things," able to "[s]peak up in front of [a] large group and voice [an] opinion or recommendation," able to "[t]alk to a GP on a level-headed articulate manner—express ideas and concerns," and "[a]ggressive—go out and look for new investment ideas, then bring them back to [the] team." *Id.* at 365. In accord with the descriptors used by Mr. Moore, Dan Chilton, a Portfolio Manager who served as a mentor to Ms. Salemi, described a Portfolio Manager as someone who is "a stand-alone person" who can "source a deal and run the whole process from start to finish." *Id.* at 369.

During her March 2011 meeting with Mr. Moore, Ms. Salemi also expressed displeasure with the job duties he was assigning her. Ms. Salemi believed she was being assigned a disproportionate number of operational tasks compared to other AI Division members. Mr. Moore rejected her request to reduce her operational tasks, noting that her performance of operational tasks—such as cash flow activities—reduced conflicts and personnel issues both in the AI Division and at PERA more generally.

Following the March 2011 meeting, Mr. Moore spoke with Defendant Angela Setter, the Human Resources Director at PERA, about providing Ms. Salemi with opportunities to improve her communication and interpersonal skills. In May 2011, Ms. Salemi met with Ms. Setter. Ms. Salemi arrived at the meeting with the intent to file a formal written complaint about the job duties assigned to her by Mr. Moore. Ms. Setter's notes from the meeting indicate Ms. Salemi said "she was being treated differently than the rest of the male employees in her division." *Id.* at 800. After Ms. Setter suggested to Ms. Salemi that the filing of a formal written complaint might "create an adversarial situation," Ms. Salemi decided against submitting the complaint. *Id.* at 528. Instead, Ms. Salemi, at Ms. Setter's suggestion, agreed to work on improving her communication skills by taking communication classes.

On June 3, 2011, Ms. Salemi, Mr. Moore, and Ms. Setter met to discuss Ms. Salemi's employment plan for 2011 and the assignment of operational tasks. During the meeting, Ms. Salemi complained that Mr. Moore had recently stated that he "d[id] not want to force the guys to work with [her]." *Id.* at 797. Following the meeting, Ms. Salemi signed up for a conference that, in her words, was "designed for professional women and

6

how they should improve their communication skills at work." *Id.* at 462. Via an e-mail,

Ms. Salemi also expressed appreciation for Ms. Setter's "help and support." *Id.*

On June 28, 2011, after another meeting with Ms. Setter, Ms. Salemi submitted a

formal written complaint. In pertinent part, the complaint, dated May 16, 2011, read:

> Dear Angela,
>
> . . . .
>
> As you may know, I joined the Alternative Investments team as an intern in May of 2004 and began working as an associate in September of 2004. I was promoted to an analyst in 2008, but only after I complained to [Ms. Paquette] that [Mr. Moore] should have, but did not, promote me. I would like to progress within the company to Portfolio Manager, but [Mr. Moore] is again holding me back and telling me that he does not see me as a Portfolio Manager.
>
> I have been dedicated to my work, and my performance proves my competence, stability, and work ethics [sic]. If you examine my past annual performance appraisal, you will find that I have been described as a team player with a positive attitude. I have had a high level of interest in learning about alternative asset class [sic]. I also brought a wealth of quantitative knowledge with me to PERA. I am confident that I have exhibited the highest work standards and my performance has been consistent in the past seven years.
>
> I'd like to bring [the] below issues that I have struggled with to your attention:
>
> • I have been treated differently than the other analysts, who are all men, working in [sic] Alternative Investments team. Since my promotion to an analyst, I have not been functioning at my job descriptions. My core responsibilities have always been around the operational activities. I am given the responsibilities that no one else wants, including managing "zombie GPs" and administrative duties. I have not been allowed to develop like the male analysts.
>
> • I have requested from [Mr. Moore], on a continuous basis, the same opportunity given to the male analysts, but he has ignored me. The opportunity and the mentorship he has provided to other colleagues with similar education and background have not been given to me.
>
> • After my promotion, I found out my compensation was not even placed within an analyst range. This situation was not corrected until the consultant began its review of the investment professionals'

7

compensation four months later. I think I was the only one in this situation.

  • My male colleagues have been assigned to the most promising opportunities which enable them to move up in their careers where as it is a constant struggle for me to move forward. I have been given a [sic] numerous excuses by [Mr. Moore] in the past few years.

  • When I asked about my future career at PERA at my year-end review, [Mr. Moore] told me that a new title called "system something" could be created for me in the future if I take more responsibilities. The words operation and system were also added to my 2011 plan. I feel like I have been taking a step backward when others have been moving up.

      . . . .

  • Lastly, [Mr. Moore] said I was closed because I fold my arms across my chest. In my culture, crossed arms are a sign of respect. I find it unfair that I have been judged by my body language. I should not be judged by it or my quiet nature. Employees should be treated based on merit and performance. The past performance is a great indication of an employee's future performance.

  At this point, I feel that my repeated verbal requests about the inadequate attention to my situation have yielded no results. I have little direction and I have received little guidance on what the future holds for me at PERA. I have enjoyed working with my colleagues and I have no wish to be moved to a different team. I'd like to reiterate that I have worked diligently in the past seven years and I have been a value add [sic] member of the AI team. While my quiet nature is being held against me, it should not prevent me from moving forward in my career. The "quiet employee" is oftentimes the most knowledgeable and competent employees [sic]. I could name many PERA's [sic] employees that are quiet in nature. I trust you will agree, and I look forward to your assurance that a formal plan would be formulated to enable me to develop and grow professionally.

I thank you in advance for addressing my concerns.

Sincerely,

Elham Salemi

*Id.* at 465–66.

8

Shortly thereafter, in July 2011, Ms. Salemi submitted FMLA leave paperwork. Ms. Salemi's medical professional was unable to determine when Ms. Salemi could return to work and indicated that Ms. Salemi was unable to perform her job functions because her "work environment [was] too stressful and hostile." *Id*. at 3651. Before Ms. Salemi started FMLA leave, PERA initiated an internal investigation into the allegations in Ms. Salemi's formal written complaint. The notes from interviews of employees at PERA provide the following information.

Mr. Moore opined that Ms. Salemi was not suited for the Portfolio Manager track because she was not comfortable with "conflict," "speaking in front of others," and "being assertive." *Id* at 364. Mr. Moore also indicated that Ms. Salemi did not volunteer for opportunities or client meetings during weekly internal meetings and that her lack of initiative was the reason why she had not had as many opportunities as other members of the AI team. Mr. Moore further stated that on the few client trips Ms. Salemi attended she often did not add any value because she either "fumbled" or remained quiet and only took notes. Finally, Mr. Moore contended that many of the operational duties Ms. Salemi previously performed were shifted to another employee and that Ms. Salemi often incorrectly characterized duties as operational.

Aaron Norton, a Portfolio Manager on the AI team and someone who served as a mentor to Ms. Salemi, indicated that while Ms. Salemi was good at performing assigned tasks, she did not take initiative or speak up in meetings. Mr. Norton also discussed a due diligence opportunity he provided her, which he said "didn't go well" because she did not ask any questions during the meeting. *Id.* at 366. And, based on

Ms. Salemi's performance at the meeting, Mr. Norton indicated he would be "hesitant" to go on another client meeting with Ms. Salemi and that Ms. Salemi should not be tasked with leading another meeting. *Id*. Mr. Norton attributed some of Ms. Salemi's problems to "cultural hurdles in the way she views men and interacts with them." *Id.* While stating that he "feels for Ellie" and "likes her a lot," Mr. Norton indicated that she had not demonstrated the "confidence" to be a Portfolio Manager. *Id.*

John Kasic, another Portfolio Manager on the AI team, described Ms. Salemi as "very professional," "nice," and "bright" but also noted that she was "[v]ery shy and introverted." *Id.* at 367. Mr. Kasic noted that in the 100 or so internal meetings he attended with Ms. Salemi, "she has never ever asked a question." *Id.* Mr. Kasic also stated that when he mentored Ms. Salemi for a year and "tried to pull her in on certain projects it was difficult to get the quality of product that he wanted." *Id.* Mr. Kasic attributed the tasks assigned to Ms. Salemi by Mr. Moore as an attempt to accommodate her introverted nature in that analytic duties, as opposed to client-based duties, do not require the same interpersonal and communication skills. Mr. Kasic also stated that everyone on the AI team has the same opportunities to sign up for projects.

Dan Chilton, a third Portfolio Manager on the AI team, indicated that opportunities are available for everyone. Mr. Chilton could think of only one meeting in seven years where Ms. Salemi spoke up and expressed an opinion. Along those

10

lines, in the year that Mr. Chilton served as Ms. Salemi's mentor, she hardly asked him for any advice.

Dave Saunders, who joined the AI team as an Analyst in 2010, indicated that everyone on the AI team had an equal opportunity to take on projects and present ideas. Mr. Saunders indicated that Ms. Salemi is not treated differently than other members of the AI team.

Ms. Setter acknowledged that Ms. Salemi arrived at the May 2011 meeting with the intent to file a formal written complaint. Ms. Setter "encouraged [Ms. Salemi] not to" submit the complaint and suggested that "they should try to work on things and make it work out." *Id.* at 377–78. Finally, several other PERA employees or clients of PERA who had more limited interactions with Ms. Salemi all indicated that Ms. Salemi was quiet, reserved, did not ask necessary questions, and was not ready for bigger responsibilities that involved interaction with clients.

With counsel present, Ms. Salemi provided information to PERA's internal investigators. Ms. Salemi alleged that men on the AI team made fun of women behind their backs after weekly meetings and that Ms. Setter brought up Ms. Salemi's sex and national origin during one of their meetings. Ms. Salemi contested whether Mr. Saunders performed any operational duties, specifically whether he was tasked with any cash flow activities. Ms. Salemi also complained that she was not given the same opportunities to interact with clients and to attend off-site client meetings as were given to Mr. Chilton and Mr. Saunders. Ms. Salemi, however, admitted that Mr. Moore's reason for not giving her more opportunities or promoting her to the position

11

of Portfolio Manager centered on the fact that she was not confrontational enough. Ms. Salemi also admitted that members of the AI team could "take as many [meetings] as you want." *Id.* at 375. Finally, Ms. Salemi attributed her inability to rise in PERA to Mr. Moore not providing her proper training, and she viewed operational assignments as punishment for doing a good job on operational assignments.

On September 1, 2011, PERA mailed Ms. Salemi a letter informing her that the internal investigation resulted in the conclusion that the allegations in her complaint were "unsubstantiated." *Id.* at 467. On September 29, 2011, while on FMLA leave, Ms. Salemi, through counsel, submitted a charge of discrimination to the EEOC. The charge identified sex, national origin, and retaliation as forms of discrimination and stated that the discrimination was a continuing action, which spanned from September 2004 to the date of the charge.[3] Ms. Salemi's charge alleged she was rejected for a promotion in 2010 but that two male employees, who joined the AI team after her, received a promotion. Ms. Salemi further alleged she was paid less than her male counterparts and was given administrative and operational tasks not assigned to them. Ms. Salemi stated:

> Because of my quiet and feminine nature, I have been judged as unable
> to do the work of the males in my department. My body language has
> also been criticized. For example, my boss has criticized me for

---

[3] Ms. Salemi also checked off "other" as a basis for her claim of discrimination but her narrative does not identify any other basis for discrimination. Further, it is not apparent from the charge how the discrimination started in September 2004 where the only pre-2008 event discussed in the charge's narrative is PERA hiring Ms. Salemi.

crossing my arms during conversation, but that is a sign of respect in my Persian culture.

*Id.* at 795. The charge also raised alleged incidents of retaliation by Mr. Moore and Ms. Setter.

Ms. Salemi returned from FMLA leave on December 19, 2011. On January 5, 2012, Mr. Moore conducted Ms. Salemi's performance review for 2011. As in the prior years, Mr. Moore ranked Ms. Salemi as "fully successful." Relative to Ms. Salemi's communication skills, Mr. Moore stated, "Ellie has a strong base of knowledge and I continue to encourage her to be more vocal in both internal and external meetings. She has much to offer the team and after many years of observing, I would challenge her to be more communicative in our discussions." *Id.* at 746.

Mr. Moore's evaluation comments about Ms. Salemi's quiet nature and her need to improve her communication skills are consistent with some of Ms. Salemi's own statements and actions. For instance, notes from a meeting between Ms. Salemi and two PERA employees who investigated Ms. Salemi's internal complaint of discrimination indicate Ms. Salemi stated she lacked sufficient knowledge to be confrontational. And, in her internal complaint of discrimination, Ms. Salemi acknowledged her "quiet nature." *Id.* at 466. Similarly, in her EEOC charge, Ms. Salemi admitted she was "quiet" in nature. *Id.* at 795.

On January 16, 2012, Mr. Moore selected Mr. Saunders for a promotion to the position of Portfolio Manager. Also after her return from FMLA leave, Ms. Salemi began providing Mr. Moore with weekly reports detailing the tasks she performed

13

and identifying how much time she spent on tasks that she classified as administrative or operational. In a March 22, 2012, response to one of Ms. Salemi's weekly reports, Mr. Moore disagreed with Ms. Salemi's categorization of some of the tasks she performed as administrative or operational. Mr. Moore's response also raised concerns about Ms. Salemi's job performance, stating that "[t]he work that [she] presented at our internal meetings has been incomplete, invalid and unsatisfactory." *Id.* at 763. Further, Mr. Moore's response questioned the amount of time it was taking Ms. Salemi to complete some tasks, including cash flow activities. Finally, Mr. Moore's response indicated that he did not see "any progress being made with team building, communicating with other team members or contribution to the dialogue and debate with the team and the investment process." *Id.*

Ms. Salemi replied to Mr. Moore's response, indicating that when she tried to speak up in a meeting her ideas were met with "hostile" feedback rather than "positive feedback." *Id.* at 765. Ms. Salemi also questioned Mr. Moore's assessment of her performance given her "fully successful" performance appraisals during her seven years at PERA. And Ms. Salemi raised continued complaints about the tasks assigned to her by Mr. Moore and the lack of "opportunity to get involved with [the] investment decision making process." *Id.* at 766. Ms. Salemi concluded her reply e-mail by stating:

> I am concerned that I continue to be treated differently because I am a woman and now, after complaining about discrimination, I am also being retaliated against. I am and always have been a strong performer. I just want the same opportunities to advance [] that the men in the department have received.

14

*Id.*

Around the time of this interchange between Mr. Moore and Ms. Salemi, Andy Ward, a peer investor who did business with PERA, approached several individuals in the AI Division, including Mr. Moore, about a conversation he had with Ms. Salemi when she was performing a due diligence exercise. Mr. Ward indicated that he was "appalled" by his conversation with Ms. Salemi, that Ms. Salemi had no valuable information to offer, and that he was disappointed that PERA would have someone as unknowledgeable and "junior" as Ms. Salemi call him. *Id.* at 349, 445. Following his conversation with Mr. Ward, Mr. Moore contacted Ms. Paquette to recommend that PERA terminate Ms. Salemi's employment.

On May 9, 2012, several PERA employees, including Mr. Moore, Ms. Setter, and Ms. Paquette, met to discuss Ms. Salemi's employment at PERA. Notes from the meeting show the group concluded that Ms. Salemi had not improved her communication skills, had not taken initiative like other members of the AI Division, and "[p]uts PERA at risk from a reputational standpoint." *Id.* at 772. The group also determined that Ms. Salemi failed to deliver on bigger projects she was assigned after her return from FMLA leave and that she did not seek out additional work after returning from leave. Overall, the group noted that Ms. Salemi's performance had deteriorated, that she could not keep up with changes in the process for analyzing investment opportunities, and that she had not improved her communication skills. With Ms. Paquette's approval, the group decided to terminate Ms. Salemi's

15

employment at PERA. On May 10, 2012, Mr. Moore sent Ms. Salemi a notice terminating her employment based on "unsatisfactory performance." *Id.* at 803.

### B.     *Procedural Events & History*

The EEOC issued Ms. Salemi a right to sue letter and she initiated this action in the United States District Court for the District of Colorado. Through an amended complaint, Ms. Salemi advanced seven claims for relief: (1) discrimination and failure to promote under Title VII; (2) retaliation under Title VII; (3) race and national origin discrimination under 42 U.S.C. §§ 1981, 1983; (4) retaliation under §§ 1981, 1983; (5) retaliation under the First Amendment, through a § 1983 claim; (6) retaliation under the FMLA; and (7) wage discrimination under the EPA. Claims One and Two were against PERA, Claims Three through Five were against Mr. Moore and Ms. Setter in their individual and official capacities, and Claims Six and Seven were against all three defendants.

Defendants moved for summary judgment on all of Ms. Salemi's claims for relief. While Defendants' motion for summary judgment was pending before the district court, the parties submitted a proposed final pretrial order. In that filing, the parties described Ms. Salemi's claims as follows:

> Ellie Salemi brings claims against all Defendants for Race/National Origin Discrimination and Retaliation pursuant to 42 U.S.C. § 1983 under 42 U.S.C. § 1981; claims against all Defendants for First Amendment Retaliation pursuant to 42 U.S.C. § 1983; claims against all Defendants for Retaliation in violation of the Family Medical Leave Act, 29 U.S.C. § 2615(a); *claims against all Defendants for Wage Discrimination in violation of Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1)*; and claims against Defendant PERA for Discrimination, Failure to Promote, and

16

> Retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.

*Proposed Pretrial Order*, *Salemi v. PERA*, No. 1:13-cv-02826-WYD-CBS (D. Colo. Aug. 20, 2015), ECF No. 74 at 10 (emphasis added). A magistrate judge adopted this portion of the parties' proposed final pretrial order without modification. *See* App'x at 813. Thereafter, the district court granted Defendants' motion for summary judgment on all claims except for the EPA wage discrimination claim as against PERA.

Before trial on the surviving EPA wage discrimination claim, PERA filed a motion in limine to exclude testimony about Ms. Salemi's emotional distress on the ground that emotional distress is not a compensable damage within an EPA wage discrimination claim. In response, Ms. Salemi suggested that her amended complaint raised a claim for retaliation under the EPA—a claim she asserted allowed for emotional distress evidence and damages. At a hearing on PERA's motion in limine, the district court ruled that Ms. Salemi had not raised a claim for retaliation under the EPA. Ms. Salemi then made an oral request to amend her complaint. Because the parties had approved a final pretrial order and prepared their cases for trial based on that order, the district court denied the request to amend. At the close of evidence on the EPA wage discrimination claim, Ms. Salemi made a second oral request to amend her complaint to add the EPA retaliation claim. The district court again denied Ms. Salemi's request to amend. The jury returned a verdict against Ms. Salemi on her EPA wage discrimination claim.

17

Ms. Salemi timely filed a notice of appeal. On appeal, Ms. Salemi contests the district court's grant of summary judgment as to her (1) Title VII discrimination claim; (2) Title VII retaliation claim; (3) § 1981 retaliation claim against Mr. Moore and Ms. Setter in their individual capacities; (4) First Amendment retaliation claim against Mr. Moore and Ms. Setter in their individual capacities; and (5) FMLA retaliation claim as against PERA. Ms. Salemi also contests the district court's construction of her amended complaint and its denial of her requests to submit an EPA retaliation claim to the jury.

## II.      DISCUSSION

### A.      *Claims Dismissed at Summary Judgment*

### 1.  Standard of Review

We review the district court's rulings on summary judgment de novo, applying the same standard as the district court. *See Universal Underwriters Ins. Co. v. Winton*, 818 F.3d 1103, 1105 (10th Cir. 2016). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). For purposes of summary judgment, "[t]he nonmoving party is entitled to all reasonable inferences from the record." *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). However, "if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at 1143–44. Finally, "we can affirm on any ground

18

supported by the record, so long as the appellant has had a fair opportunity to address that ground." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1108 (10th Cir. 2009) (internal quotation marks omitted).

## 2. Preservation Requirement

"A federal appellate court will not consider an issue not passed upon below." *F.D.I.C. v. Noel*, 177 F.3d 911, 915 (10th Cir. 1999) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). "Consequently, when a litigant fails to raise an issue below in a timely fashion and the court below does not address the merits of the issue, the litigant has not preserved the issue for appellate review." *Id.* To properly raise an argument below, a litigant must present the argument "with sufficient clarity and specificity." *Folks v. State Farm Mut. Auto. Ins. Co.*, 784 F.3d 730, 741 (10th Cir. 2015). To this point, "vague, arguable references to a point in the district court proceedings do not preserve the issue on appeal . . . because such perfunctory presentation deprives the trial court of its opportunity to consider and rule on an issue in any detail." *Id.* (citation and internal quotation marks omitted). Furthermore, "[b]ecause of the importance of raising an issue below, we have consistently turned down the argument that the raising of a related theory was sufficient to preserve an issue for appeal." *Cummings v. Norton*, 393 F.3d 1186, 1190 (10th Cir. 2005) (internal quotation marks omitted). Likewise, we have held that "[a]dvancing an argument for one cause of action . . . does not constitute raising it for all causes of action." *Id.* at 1190; *see id.* at 1191 (concluding argument raised in support of failure

19

to accommodate claim did not preserve appellate review of that argument relative to dismissal of wrongful termination claim).

### 3. Title VII Claims

#### a. *Exhaustion of Administrative Remedies*

"Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Under the provision, an employee must file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice giving rise to the charge unless the employee has initially instituted proceedings with a State or local agency, in which case the employee has 300 days to file her EEOC charge.[4] 42 U.S.C. § 2000e-5(e)(1). "A plaintiff normally may not bring a Title VII action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue-letter." *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1194 (10th Cir. 2004) (quotation marks omitted).

"[E]ach discrete incident of [discriminatory or retaliatory] treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (citing *Morgan*, 536 U.S. at 110–13). Discrete incidents of discrimination

---

[4] Ms. Salemi filed her initial charge with both the EEOC and the Colorado Civil Rights Division; thus, her charge triggered the 300-day provision in 42 U.S.C. § 2000e-5(e)(1).

include termination, failure to promote, and denial of training opportunities. *Morgan*, 536 U.S. at 114–15. And the Supreme Court has generally rejected the continuing violation theory—a theory under which a plaintiff's belated EEOC charge is timely with respect to discrete incidents of discrimination or retaliation that occur more than 300 days before the charge on the ground that several discrete incidents are all part of a continual pattern of discrimination.[5] *Id.* at 108, 110; *see id.* at 106–07 (describing continuing violation theory). Thus, a plaintiff fails to timely exhaust her administrative remedies relative to a discrete incident of discrimination or retaliation that occurs more than 300 days before she files a charge with the EEOC. *Id.* at 110. Additionally, where discrete incidents of discrimination occur after an employee files an initial EEOC charge, the employee must file an additional or amended EEOC charge to satisfy the exhaustion requirement. *See Martinez*, 347 F.3d at 1210 (finding allegations as to September 2000 reprimand and April 2001 termination unexhausted where employee filed charge in July 1999 even though September 2000 and April 2001 incidents were part of a continuing pattern of alleged unlawful action).

Ms. Salemi filed her sole EEOC charge on September 29, 2011. The rules governing exhaustion caused the district court to determine Ms. Salemi properly exhausted her administrative remedies only for discrete incidents occurring between December 3, 2010, and September 29, 2011—the 300-day period before Ms. Salemi filed her EEOC charge. Thus, in considering Ms. Salemi's Title VII claims, the

---

[5] An exception to this general rule rejecting the continuing violation theory exists with respect to a hostile work environment claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

district court limited its analysis to allegations of discrete incidents of discrimination and retaliation that occurred during this exhaustion period.[6]

On appeal, Ms. Salemi argues the district court's exhaustion ruling improperly limited the scope of her claims because the discrimination by PERA had a cumulative effect, and she was continually denied opportunities for advancement. Ms. Salemi's argument is nothing more than a regurgitation of the continuing violation theory rejected in *Morgan*. And our post-*Morgan* case law makes clear that the continuing violation theory is not available in the context of a Title VII claim based on discrete incidents of discrimination or retaliation, including allegations of a denial of opportunities for advancement in the workplace. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 633 (10th Cir. 2012) ("[Plaintiff] can employ the continuing

---

[6] At the time the district court granted summary judgment, our precedent "steadfastly held that exhaustion of administrative remedies is a 'jurisdictional prerequisite to suit.'" *Lincoln v. BNSF Ry. Co.*, ___ F.3d ___, slip op. at 13 (10th Cir. Aug. 17, 2018) (quoting *Sampson v. Civiletti*, 632 F.2d 860, 862 (10th Cir. 1980)) (citing *MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005); *Bertsch v. Overstock.com*, 684 F.3d 1023, 1030 (10th Cir. 2012)). Applying this binding precedent, the district court held that where Ms. Salemi failed to exhaust her administrative remedies relative to a discrete incident of discrimination or retaliation, it lacked jurisdiction to consider a claim based on that discrete incident. In *Lincoln*, we overturned our precedent by vote of the full court and held that a failure to exhaust administrative remedies creates only an affirmative defense subject to principles of waiver and estoppel. *Id.* at 16–17, 19–21.

For two reasons, this change in our precedent does not impact the outcome of Ms. Salemi's case. First, unlike the plaintiffs-employees in *Lincoln*, Ms. Salemi does not challenge the district court's decision to cabin its exhaustion ruling in terms of a lack of jurisdiction. Second, unlike the defendant-employer in *Lincoln*, PERA did not waive its failure to exhaust defense; instead, it timely raised the defense in both its motion to dismiss and its motion for summary judgment. Accordingly, while the district court's decision to cabin its failure to exhaust ruling in terms of jurisdiction is no longer accurate, this inaccuracy does not alter the result that Ms. Salemi cannot advance claims for which she did not properly exhaust her administrative remedies.

violation theory only if her denial of training was not a discrete act. But . . . one of the claims *Morgan* labeled a discrete act was a denial-of-training claim. 536 U.S. at 114–15. . . . Thus, [plaintiff] cannot take advantage of the continuing violation theory to make her claim timely."). Accordingly, we, like the district court, confine our analysis of Ms. Salemi's Title VII discrimination and retaliation claims to discrete employment actions that occurred within the 300-day period before her lone EEOC charge.[7]

b. *Analysis of Discrimination Claim*

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

---

[7] In *Morgan*, the Supreme Court observed that each paycheck that comprised a claim of disparate pay constituted a discrete incident of discrimination. *Morgan*, 536 U.S. at 111–12 (citing *Bazemore v. Friday*, 478 U.S. 385, 395 (1986) (per curiam)). Subsequent to *Morgan*, Congress, by way of the Lilly Ledbetter Fair Pay Act, amended 42 U.S.C. § 2000e-5 to apparently subject claims based on disparate pay to the continuing violation theory for purposes of exhaustion such that each new incident of disparate pay resets the time period for filing an EEOC charge. *See Groesch v. City of Springfield*, 635 F.3d 1020, 1024–25 (7th Cir. 2011) (stating the Lilly Ledbetter Fair Pay Act of 2009 "amends Title VII . . . by providing that the statute of limitations for filing an EEOC charge alleging pay discrimination resets with each paycheck affected by a discriminatory decision"); *see also* 42 U.S.C. § 2000e-5(e)(3). Ms. Salemi, in responding to the Defendants' exhaustion argument in their motion for summary judgment, however, failed to raise an argument based on 42 U.S.C. § 2000e-5(e)(3) and her fleeting reference to the Lilly Ledbetter Fair Pay Act was within the context of her failure to promote claim, not her contention that she received less pay than similarly situated male employees. *See* App'x at 3721–23. Accordingly, although Ms. Salemi mentions 42 U.S.C. § 2000e-5(e)(3)(A) in her opening brief on appeal, any argument based on this provision is not properly preserved for appellate review with respect to the disparate pay aspect of her discrimination claim. Therefore, we also confine our review of Ms. Salemi's Title VII claims based on disparate pay to her salary during the 300 days leading up to her EEOC charge.

23

respect to [her] compensation, terms of conditions, or privileges of employment, because of such individual's . . . sex[] or national origin." 42 U.S.C. § 2000e-2(a)(1). On appeal, Ms. Salemi argues that PERA discriminated against her in three ways: (1) failure to promote, (2) disparate pay, and (3) denial of professional growth opportunities. Ms. Salemi advances her failure to promote allegation both as a standalone claim of discrimination and as a claim of discrimination when considered in combination with her other allegations of discrimination. Thus, we start our analysis with Ms. Salemi's contention that PERA discriminated against her by not promoting her.

i. Failure to promote

A claim for discrimination based on a failure to promote is subject to the *McDonnell Douglas*[8] burden-shifting framework, under which the plaintiff has an initial burden of establishing a prima facie case. *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003). One version of the *McDonnell Douglas* burden-shifting framework we have employed relative to a failure to promote allegation requires the plaintiff to demonstrate "(1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled."[9] *Id.* If the plaintiff satisfies

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[9] At times, we have identified the fourth element as: "after plaintiff's rejection, 'the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (quoting *McDonnell Douglas*, 411 U.S. at 802)).

her initial burden, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its employment action." *Id.* If the employer satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is a pretext for discrimination. *Id.* A plaintiff may establish pretext by showing that the reason offered by the employer is "factually false" or by showing "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quotation marks omitted).

Based on our earlier discussion of exhaustion, the only employment action properly before us on this claim is Mr. Moore's rejection of Ms. Salemi's March 2011 request for a promotion to the position of Portfolio Manager. The district court concluded Ms. Salemi failed to demonstrate that she was qualified for the promotion as required by the second element of the prima facie case.

In considering the second element of the prima facie case, "[w]e have long respected employers' wide latitude in setting job standards and requirements and in deciding whether applicants meet those standards." *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1275 (10th Cir. 2006) (internal quotation marks omitted). From this, "we have held that it is not the fact finder's task to assess which of an employer's

---

Because Ms. Salemi fails to satisfy her burden on other aspects of her claim, we need not determine the proper phrasing of the fourth element or whether Ms. Salemi preserved an argument based on the language employed in *Kendrick* rather than the language employed in *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).

stipulated qualifications ought to be required of applicants for a particular position." *Id.* (internal quotation marks omitted). Finally, a court may look to a written job description to help determine the qualifications and essential job functions of a position. *See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009) (identifying job description as factor to consider but doing so in context of ADA claim).

Ms. Salemi presents two arguments for why the district court erred in concluding that she failed to advance sufficient evidence demonstrating she was qualified for the Portfolio Manager position. First, Ms. Salemi contends that her strong aptitude for analysis and her fully successful overall ratings on her appraisal reviews demonstrate that she met the objective criteria for the position. We are unpersuaded by this argument. Successful performance at a lower position does not establish that an employee is qualified for a higher position even where there is some overlap between the duties of the lower and higher positions. *See Hickman v. Flood & Peterson Ins.*, 766 F.2d 422, 425 (10th Cir. 1985) (holding trial court did not err in concluding that employee who successfully performed secretarial duties and occasionally sold insurance to walk-in customers was not qualified to serve as an insurance salesperson).

Application of this principle from *Hickman* is particularly apt here. While there was partial overlap between the work performed by Analysts and the work performed by Portfolio Managers, some responsibilities assigned to Portfolio Managers were not assigned to Analysts, or at least not assigned to Ms. Salemi. In

26

advancing her denial of opportunities argument, Ms. Salemi contends she was not assigned some of the tasks and work assigned to Portfolio Managers. Thus, Ms. Salemi's successful performance as an Analyst is not sufficient to demonstrate that she met the objective qualifications of the Portfolio Manager position.

Ms. Salemi next contends that an individual's failure to meet an employer's subjective qualification criteria is not an appropriate basis for granting summary judgment at the prima facie stage. But here, there is no genuine factual dispute regarding whether Ms. Salemi satisfied all of the subjective qualifications of the position. Specifically, the job description identified "[s]trong oral and written communication skills" as a qualification. App'x at 668. The uncontroverted evidence, including Ms. Salemi's own statements, demonstrates that Ms. Salemi was quiet in nature, did not speak up in internal meetings, and struggled with communication skills in her Analyst position. And importantly, the Analyst position required her to communicate mostly with AI Division members, while the Portfolio Manager position would require her to communicate with clients, peer investors, and PERA employees outside the AI Division. Thus, the only question is where in the *McDonnell Douglas* burden-shifting framework the district court should have considered Ms. Salemi's failure to advance evidence demonstrating she met this subjective qualification for the Portfolio Manager position.

To be sure, we have stated:

[A] plaintiff cannot prove that he was discriminated against simply because an employment decision was based on subjective criteria. As one court aptly put it, however, "just as use of subjective criteria does

27

> not establish discrimination, cloaking such criteria with an appearance of objectivity does not immunize an employment decision from a claim of discrimination."

*Cortez*, 460 F.3d at 1275 (quoting *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000)). In this vein, we have held a district court may consider subjective qualification criteria at the second and third steps of the *McDonnell Douglas* burden-shifting framework rather than when evaluating whether the plaintiff established she was qualified for a position at the first step of the framework. *Burrus v. United Tele. Co. of Kan.*, 683 F.2d 339, 342 (10th Cir. 1982). But, we have also noted "while it is true that the use of a subjective consideration to reject an otherwise qualified individual may entitle that individual to an inference of discrimination, it does not *require* such an inference." *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1239 n.19 (10th Cir. 1991), *abrogated by statute on other grounds*. And, "whether a case is decided pursuant to a *prima facie* showing or on the merits is of academic importance only." *Hickman*, 766 F.2d at 426.

Although our case law favors considering whether an applicant satisfied subjective qualification criteria at the pretext stage, we do not fault the district court for considering this issue at the prima facie stage, given Ms. Salemi's numerous admissions regarding her quiet nature and her need to improve her communication skills. Where several of the essential functions of the Portfolio Manager position require communication with non-AI Division individuals and service on committees, the subjective criteria of "[s]trong oral and written communication skills" permeates

28

into several of the seemingly objective functions.[10] And because no reasonable jury could find that Ms. Salemi possessed "[s]trong oral and written communication skills" or was able to perform the essential job functions requiring strong oral communication skills, the issue of whether the district court should have considered this deficiency in Ms. Salemi's evidence at the prima facie stage or the pretext stage is academic.[11] Accordingly, we affirm the district court's grant of summary judgment on Ms. Salemi's failure to promote claim.

ii. Allegations of discrimination in combination

Having concluded that Ms. Salemi failed to establish that discrimination played any role in PERA's decision not to promote her, the combined discrimination claim rises and falls on her allegations of disparate pay and the denial of professional growth opportunities.

1) Disparate pay

Ms. Salemi's attempt to establish discrimination through disparate pay fails for two reasons. First, Ms. Salemi did not properly preserve the argument below. In responding to Defendants' motion for summary judgment, Ms. Salemi described the adverse actions that comprised her discrimination claim and stated that she:

---

[10] Ms. Salemi does not contend that listed essential functions, such as "conducts extensive reference checks and legal and business negotiations," "coordinates activity with investment counsel," and "[m]aintains relationship base with current and potential investment partners and peer groups by serving on advisory committees," App'x at 668, are subjective in nature.

[11] In the district court, and on appeal, PERA advanced arguments for dismissing Ms. Salemi's failure to promote claim at the pretext stage.

was treated less favorably than her similarly-situated male colleagues *when she was paid less than they were*, when she was given less attractive and even demeaning administrative and even secretarial assignments, when she was deprived of equal opportunities to perform all aspects of her position and her ability to succeed in the job by doing so, when she was not promoted on equal terms as the white men, when she was retaliated against for objecting to the disparate treatment, and ultimately, when she was fired for pretextual reasons.

App'x at 3734–35 (emphasis added). But Ms. Salemi did not present any arguments regarding the specific differences in her pay relative to any similarly-situated male employees, but instead argued that the items in her list collectively amounted to an adverse action. *See id.* at 3734–36. Ms. Salemi therefore did not present a sufficient argument in the district court to put the district court on notice that it needed to address a disparate pay basis for discrimination relative to her Title VII discrimination claim. *See Folks*, 784 F.3d at 741 (requiring argument be presented with "sufficient clarity and specificity"). It is thus not surprising that, in resolving Defendants' motion for summary judgment, the district court did not address disparate pay when evaluating the discrimination claim. Finally, while Ms. Salemi's response to summary judgment did present an argument about disparate pay relative to her EPA wage discrimination claim, our precedent holds that a party does not preserve an argument relative to one claim by advancing the argument with respect to a different claim. *Cummings*, 393 F.3d at 1190–91.

Second, even if Ms. Salemi had properly preserved her argument based on disparate pay, she failed to advance evidence sustaining her burdens under the *McDonnell Douglas* framework. "[A] female Title VII plaintiff establishes a *prima*

30

*facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997). "Once a *prima facie* case is established, the defendant must articulate a legitimate, non-discriminatory reason for the pay disparity." *Id.* (internal quotation marks omitted). "Once the defendant advances such a justification, the plaintiff must show that the defendant, regardless of the proffered reasons, intentionally discriminated against her." *Id.*

During the exhaustion period, Ms. Salemi and Mr. Saunders were both Analysts in the AI Division.[12] In 2011, Ms. Salemi was a grade 13P employee with an annual salary of $90,400. Meanwhile, Mr. Saunders was a grade 13P employee with an annual salary of $90,900. Thus, the evidence shows that, during the exhaustion period, Ms. Salemi's annual salary was one half of one percent less than her similarly-situated male counterpart. PERA presented evidence attributing this slight difference in salary to Mr. Saunders joining the AI Division through a merger with the Denver Public Schools Retirement System and a corresponding state law requirement that PERA pay Mr. Saunders at a rate at least equivalent to what he was making prior to the merger.[13] *See* Colo. Rev. Stat. § 24–51–1748(1) ("Each staff

---

[12] On appeal, Ms. Salemi attempts to compare herself to the male Portfolio Managers. But, Ms. Salemi was never promoted to Portfolio Manager and argues that she did not receive the work opportunities that were assigned to the Portfolio Managers. Ms. Salemi cannot have it both ways; if her job was not similar to the Portfolio Managers, then she is not entitled to the same pay.

[13] The record evidence further shows that while the state statute compelled PERA to pay Mr. Saunders at a rate much higher than Ms. Salemi's salary during the

member employed by the Denver public schools retirement system on the date of the merger shall be hired as an employee-at-will of the association *at a salary not less than the annual salary received from the Denver public schools retirement system as of the merger date . . . .*" (emphasis added)). Meanwhile, Ms. Salemi provides no evidence to undermine or overcome PERA's gender-neutral explanation for the slight difference in salary. Accordingly, although Ms. Salemi failed to preserve her argument based on disparate pay, even if she had preserved the argument, she has not carried her burdens under the *McDonnell Douglas* framework.

      2)   Denial of professional growth opportunities

Ms. Salemi contends that PERA discriminated against her by denying her opportunities for professional growth. To establish a prima facie case of discrimination generally, a plaintiff must "show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination."[14] *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). PERA argues the denial of professional growth opportunities is not an adverse employment action and Ms. Salemi failed to advance evidence permitting an inference of discrimination.

---

pre-exhaustion, 2010 calendar-year, PERA all but evened out the two salaries by giving Ms. Salemi a 13% raise for 2011 while only giving Mr. Saunders a 1% raise.

    [14] Unlike with the failure to promote or disparate pay arguments, neither party directs us to a prima facie standard specific to discrimination based on a denial of opportunities, and we are not aware of such a standard.

32

The district court concluded Ms. Salemi "ha[d] not demonstrate[d] that she suffered any adverse employment action within the 300 day time period *due to any discriminatory intent by PERA*." App'x at 1048 (emphasis added). On appeal, Ms. Salemi contests the district court's first conclusion—the denial of professional growth opportunities does not constitute an adverse action—but she does not challenge the district court's second conclusion that she failed to satisfy the third element of her prima facie case by advancing evidence that permits an inference of discrimination. By not presenting an argument in opposition to the district court's adverse conclusion on the third element of her prima facie case, Ms. Salemi has waived appellate review of the district court's determination that she did not establish a prima facie case of discrimination based on the denial of professional growth opportunities. *See Starkey ex rel. A.B. v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244, 1252 (10th Cir. 2009) ("When an appellant does not challenge a district's court's alternate ground for its ruling, we may affirm the ruling."); *see also Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997) ("Issues not raised in the opening brief are deemed abandoned or waived.").

iii.    Summation

We affirm the district court's grant of summary judgment on Ms. Salemi's failure to promote and discrimination claims because Ms. Salemi did not (1) advance sufficient evidence demonstrating that she met the qualifications for the Portfolio Manager position; (2) preserve her disparate pay argument or establish a disparity in pay attributable to discrimination; and (3) challenge one of the district court's bases

for rejecting her discrimination claim arising from the denial of professional growth opportunities.

c. *Analysis of Retaliation Claim*

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII] or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Absent direct evidence of retaliation, a plaintiff's claim of retaliation under Title VII is subject to the *McDonnell Douglas* burden-shifting framework. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008). To make out a prima facie case, a plaintiff must demonstrate that "(1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found her employer's subsequent action to be materially adverse; and (3) a causal connection exists between her protected activity and the employer's action." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009).

The district court concluded that Ms. Salemi first engaged in protected activity on May 18, 2011, when she made a verbal complaint to Ms. Setter. The district court further determined that Ms. Salemi did not experience a materially adverse action between the date of her protected activity and the end of the exhaustion period—September 29, 2011. Accordingly, the district court held that Ms. Salemi did not advance evidence to sustain a Title VII retaliation claim.

34

Ms. Salemi raises two challenges to the district court's grant of summary judgment. First, Ms. Salemi contends the district court incorrectly determined the date on which she first engaged in protected activity, arguing that her March 4, 2011, meeting with Mr. Moore qualified as protected activity. But Ms. Salemi failed to preserve this argument when responding to Defendants' motion for summary judgment. Ms. Salemi provided a two-sentence argument regarding what protected activity she engaged in: "Ms. Salemi easily establishes a prima facie case of retaliation because of the multitude of instances in which she, reasonably and in good faith, articulated her opposition to discrimination. Defendants cannot seriously take issue with this element of the claim." App'x at 3738 (citations omitted). Relative to the first sentence, Ms. Salemi cited paragraphs 108, 139, 151, 166, 170, 177, 185, 187, 196, and 209 of her response to PERA's statement of material facts and her statement of additional disputed material facts. None of the paragraphs cited mention any March 2011 conduct engaged in by Ms. Salemi. In fact, the only paragraphs that include a statement of fact regarding Ms. Salemi opposing alleged discrimination and engaging in protected activity are (1) paragraph 177, which involves her request to meet with Ms. Setter in *May 2011*; (2) paragraph 185, which involved a *June 2011* meeting with Ms. Setter; and (3) paragraph 209, which discusses an April 6, *2012*, communication to Mr. Moore. Accordingly, Ms. Salemi failed to preserve any argument that she engaged in protected activity as early as March 2011. Therefore, we, like the district court, limit our review of Ms. Salemi's retaliation claim to events occurring between May 18, 2011, and September 29, 2011.

35

Second, Ms. Salemi argues the district court erred in concluding that she did not experience a materially adverse action as a result of retaliation between May 18, 2011, and the filing of her EEOC charge on September 29, 2011. Ms. Salemi identifies three actions she contends satisfy the second and third elements of her prima facie case: (1) removing her from consideration for a promotion to the position of Portfolio Manager, (2) assigning her menial work, and (3) Ms. Setter discouraging her from filing a formal, internal written complaint. We are unpersuaded that Ms. Salemi has sustained her burden.

Regarding the first two actions, an employer "need not suspend previously planned adverse employment actions upon encountering an employee's protected activity." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1192 (10th Cir. 2016) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)). Applying this principle, it is apparent that Mr. Moore concluded Ms. Salemi was not qualified for a promotion to the Portfolio Manager position as early as January 2010 and certainly by March 2011. That is, Mr. Moore removed Ms. Salemi from the Portfolio Manager promotion track before Ms. Salemi engaged in protected activity in May 2011, and his continuing belief that Ms. Salemi was not qualified for the Portfolio Manager position cannot rationally be attributed to Ms. Salemi having, by then, engaged in protected activity. Likewise, Ms. Salemi's amended complaint alleges that Mr. Moore was assigning her administrative and operational tasks, primarily cash flow activities, before May 2011. And Ms. Salemi does not direct us to any evidence establishing an uptick in the number of assigned administrative and operational tasks between May 18, 2011, and September 29, 2011, a majority of which time Ms. Salemi was on FMLA leave.

As to the third alleged materially adverse action—Ms. Setter discouraging her from filing a written complaint—Ms. Salemi fails to cite any case law for the proposition that discouraging an employee from filing a formal, internal written complaint is a materially adverse action. Accordingly, Ms. Salemi has not adequately developed this argument. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that . . . are inadequately presented[] in an appellant's opening brief.").

In summation, Ms. Salemi failed to preserve her argument that she engaged in protected activity as early as March 2011. Ms. Salemi also failed to carry her burden of demonstrating that, after May 18, 2011, she suffered a materially adverse action attributable to her engagement in protected activity. Accordingly, we affirm the district court's grant of summary judgment on Ms. Salemi's Title VII retaliation claim.

## 4. 42 U.S.C. § 1981 Retaliation Claim[15]

Section 1981(a) of Title 42 states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

---

[15] Ms. Salemi brought her § 1981 claim under 42 U.S.C. § 1983, which provides the cause of action for damages against state actors for § 1981 violations. *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006). It is undisputed that Mr. Moore and Ms. Setter, as employees of PERA, are state actors. This same conclusion holds true relative to Ms. Salemi's First Amendment claim discussed *infra*.

37

Section 1981 "prohibits not only racial discrimination but also retaliation against those who oppose it." *Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 355 (2013)). "When courts consider § 1981 retaliation claims, the principles set forth in Title VII retaliation cases apply with equal force." *Id.* (internal quotation marks omitted). Accordingly, absent direct evidence of retaliation, a plaintiff's § 1981 retaliation claim is evaluated under a *McDonnell Douglas* burden-shifting framework. *Id.*

However, unlike Title VII, which protects against various forms of discrimination including discrimination based on sex, § 1981 protects against only discrimination based on race.[16] *See Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1447 (10th Cir. 1988) (per curiam) (holding that claim is only cognizable under § 1981 if it involves a "racial situation"), *superseded by statute on other grounds*. Thus, to state a retaliation claim under § 1981, a plaintiff must have opposed race-based discrimination. *See Parker Excavating, Inc.*, 863 F.3d at 1220. And, to establish a prima facie case of retaliation under § 1981, a plaintiff must show that "(1) [she] engaged in opposition to racial discrimination that is protected under the statute; (2) a reasonable person would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the adverse action." *Id.*

---

[16] At oral argument, Defendants conceded that national origin qualifies as race for purposes of § 1981. We accept Defendants' concession without further comment.

The district court divided Ms. Salemi's claim into two periods: (1) May 2011 through September 2011 and (2) September 2011 through Ms. Salemi's termination in May 2012.[17] Relative to the first period, the district court relied on its reasons for rejecting Ms. Salemi's Title VII retaliation claim to reject her § 1981 retaliation claim. Because the elements of a prima facie case are the same under both claims, we concur with the district court's approach as to pre-September 29, 2011, alleged adverse actions. Relative to the second period, the district court concluded Ms. Salemi's termination was the only action asserted by Ms. Salemi that qualified as adverse and that she failed to establish a causal connection between her protected activity and her termination where the two events did not occur in close temporal proximity to one another. In performing its temporal analysis, the district court considered the amount of time that elapsed between Ms. Salemi's initial complaints about discrimination in May and June 2011 and her May 2012 termination.

On appeal, Ms. Salemi identifies four post-EEOC charge actions she alleges qualify as adverse actions: (1) Mr. Moore assigning her administrative work; (2) Mr. Moore's January 2012 decision to promote Mr. Saunders to the Portfolio Manager position; (3) Mr. Moore's March 22, 2012, memo criticizing Ms. Salemi's performance; and (4) PERA's May 2012 termination of Ms. Salemi's employment.

---

[17] Because a § 1981 claim is not subject to any exhaustion requirement, *see CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008), the district court could consider alleged adverse actions occurring after Ms. Salemi's EEOC charge on September 29, 2011.

Ms. Salemi argues the district court committed two errors in analyzing her § 1981 retaliation claim.

First, Ms. Salemi contends that, for purposes of the third element of a prima facie case, the district court improperly focused exclusively on the amount of time between her protected activity and the alleged adverse actions, rather than considering the proximity of the events in combination with other evidence that supported an inference of retaliation. But Ms. Salemi does not identify what other evidence of retaliatory motive she presented to the district court and we have found none. Because Ms. Salemi has not adequately preserved or developed an argument for retaliatory motive based on anything other than the closeness in time between her protected activity and the alleged adverse actions, her ability to satisfy the third element of the prima facie case rises and falls solely on temporal proximity.

As to temporal proximity, Ms. Salemi argues the district court used the wrong starting date. Specifically, she claims the district court should have considered the time between her September 29, 2011, EEOC charge and the adverse actions, rather than the time between her first protected activity and the adverse actions. Even accepting Ms. Salemi's starting point for purposes of argument, her temporal proximity argument fails. We have held that a three-month gap, standing alone, is insufficient to establish causation between the protected activity and the adverse action. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (adopting district court's conclusion that three-month gap was insufficient to establish temporal proximity but doing so in context of retaliation claim under Fair Labor Standards

40

Act). The first adverse action occurring after Ms. Salemi's EEOC charge, as identified in Ms. Salemi's opening brief, is Mr. Moore's December 2011 assignment of administrative work. Assuming, without deciding, that the EEOC charge reset the temporal proximity clock, nearly three months passed between the EEOC charge and this alleged adverse action. As such, there is not sufficient temporal proximity between the events to establish causation without more. Here, Ms. Salemi has not offered anything more than temporal proximity to establish causation. Therefore, Ms. Salemi failed to advance sufficient evidence to satisfy the third element of her prima facie case, and we affirm the district court's grant of summary judgment on her 42 U.S.C. § 1981 retaliation claim.

## 5. First Amendment Retaliation Claim

To advance a First Amendment retaliation claim, a plaintiff must demonstrate that "(1) she was engaged in constitutionally protected activity, (2) the defendants' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity, and (3) the defendant[s'] actions were substantially motivated as a response to her protected conduct." *McBeth v. Himes*, 598 F.3d 708, 717 (10th Cir. 2010) (internal quotation marks omitted). "A government employee must show that his speech was on a matter of public concern in order for that speech to be protected under the First Amendment." *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006); *see Helget v. City of Hays*, 844 F.3d 1216, 1221 (10th Cir. 2017). In granting summary judgment, the district court concluded that Ms. Salemi's complaints of discrimination focused on her personal interactions at

PERA such that her complaints did not involve a matter of public concern or qualify as "constitutionally protected activity." Ms. Salemi argues on appeal that her EEOC charge alleged "class-based discrimination" and that speech exposing class-based discrimination in a government workplace is a matter of public concern.

Whether a statement addresses a matter of public concern is a question of law. *Leverington v. City of Colo. Springs*, 643 F.3d 719, 726–27 (10th Cir. 2011). "Matters of public concern are those of interest to the community, whether for social, political, or other reasons." *Id.* at 727 (quotation marks omitted). We determine if speech addresses a matter of public concern by evaluating "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). "The focus is therefore upon whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee." *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985) (internal quotation marks omitted); *cf. Borough of Duryea v. Guarnieri*, 564 U.S. 379, 398 (2011) ("If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must give way, as it does in speech cases."). In evaluating the distinction between public and private matters, "it is not always enough that the subject matter of a communication be one in which there *might* be general interest; rather, what is *actually said* on the topic is the crux of the public concern content inquiry." *Leverington*, 643 F.3d at 727 (internal quotation marks omitted). Finally, our analysis "may focus on the motive of the speaker and whether the speech is calculated to disclose misconduct or

merely deals with *personal disputes and grievances unrelated to the public's interest.*"
*Id.* (quotation marks omitted); *see David v. City & Cty. of Denver*, 101 F.3d 1344, 1356
(10th Cir. 1996) (concluding that statements about sexual harassment and retaliation
against the individual speaker that did not allege the same conduct against other
employees or conduct impacting the government's performance of its responsibilities did
not qualify as speech on a matter of public concern under *Connick*).

In *Connick*, the Supreme Court noted that speech by a public employee about her
public school's racially discriminatory policies qualified as speech on a matter of public
concern. 461 U.S. at 146 (citing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410
(1979)). Likewise, speech exposing class-based discrimination in a government
workplace that impacts *more than just the speaker* qualifies as speech on a matter of
public concern. *See Cotarelo*, 460 F.3d at 252 (collecting cases). Thus, if a reasonable
jury could construe Ms. Salemi's EEOC charge as raising a claim of class-based
discrimination, the charge would qualify as speech on a matter of public concern. We,
however, conclude that no reasonable jury could so construe Ms. Salemi's EEOC charge
when the charge is read on the whole and in the context of the composition of the AI
Division.

Ms. Salemi's EEOC charge did state that she was raising a charge of
discrimination "on behalf of [her]self and others similarly situated, and on a class-wide
basis." App'x at 492. Ms. Salemi also stated in her charge that there were "unequal and
unfair training practices within [her] department." *Id.* at 495. But other than an
administrative assistant, Ms. Salemi was the sole female in the AI Division. Thus, the

43

complaints about training practices could apply only to her. And while Ms. Salemi's EEOC charge alleged that Mr. Moore required the female administrative assistant to perform secretarial tasks for male Portfolio Managers, no reasonable jury could conclude that assigning an individual the type of work the individual is tasked with and paid for constitutes sex discrimination merely because the work is being performed by a female for a male. Accordingly, although Ms. Salemi uses the words discrimination on a "class-wide basis" in her EEOC charge, the charge cannot reasonably be read as advancing claims of discrimination that affected more than just Ms. Salemi. Therefore, Ms. Salemi's EEOC charge does not qualify as speech on a matter of public concern, and we affirm the district court's grant of summary judgment on her First Amendment retaliation claim because she failed to advance evidence satisfying the first element of her prima facie case.

## 6. FMLA Retaliation Claim

Claims for retaliation under the FMLA are subject to the *McDonnell Douglas* burden-shifting framework. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). To make out a prima facie case of retaliation, Ms. Salemi needed to demonstrate that "(1) she engaged in a protected activity; (2) [PERA] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Id.* at 1171 (footnote omitted). The taking of FMLA leave is a protected activity for purposes of the first element of a prima facie case. *Id.* Likewise the termination of an employee is a materially adverse action. *See id.* The district

court also concluded that a "change in job responsibilities" and a failure to promote qualified as materially adverse actions. The district court concluded, however, that Ms. Salemi failed to satisfy the third element of her prima facie case because (1) there was not a close temporal connection between when she took leave and when the materially adverse actions occurred and (2) no other evidence suggested the materially adverse actions were a consequence of Ms. Salemi taking FMLA leave.[18]

In reaching its conclusion regarding the lack of temporal proximity, the district court focused on the time that elapsed between when Ms. Salemi took FMLA leave—July 2011—and when the materially adverse actions occurred. On appeal, Ms. Salemi argues the district court should have considered the time that elapsed between when she returned from FMLA leave—December 2011—and when the materially adverse actions occurred. Assuming Ms. Salemi is correct that the temporal proximity clock commences when an employee returns from FMLA leave,[19] Ms. Salemi still fails to advance sufficient evidence to satisfy the third element of a prima facie case. On appeal, Ms. Salemi argues that, after returning from FMLA leave, she experienced a "loss of responsibilities, . . ., an increasingly aggressive campaign of written performance criticisms, and then her termination on May 10, 2012." Opening Br. at

---

[18] Separately, the district court concluded that Ms. Salemi could not bring her FMLA claim against Mr. Moore and Ms. Setter. On appeal, Ms. Salemi does not raise any arguments on this matter; instead she challenges only the dismissal of her FMLA claim as against PERA.

[19] We have previously couched our temporal proximity analysis in terms of the time that elapsed between the employee requesting FMLA leave and the adverse action. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171–72 (10th Cir. 2006).

49. The written performance criticisms occurred in March and April 2012, three and a half months after Ms. Salemi's return from FMLA leave. And the termination occurred in May 2012, five months after Ms. Salemi's return from FMLA leave. Accordingly, temporal proximity alone cannot establish a causal connection between the protected activity and these adverse actions. *See Metzler*, 464 F.3d at 1172 (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), for proposition "that a period of three months between the protected activity and the adverse action, standing alone, is not sufficient to establish causation").

As to the "loss of responsibilities," it is not clear from Ms. Salemi's opening brief, or her statement of facts in response to summary judgment, when exactly this occurred. To that point, none of Ms. Salemi's submissions in this court identify any specific dates relative to the "loss of responsibilities." And, in her deposition testimony, Ms. Salemi could not recall when after her return from FMLA Mr. Moore began changing her work responsibilities.[20] *See* App'x at 544–45, 3716. Thus, Ms. Salemi fails to advance sufficient evidence to demonstrate a causal connection

---

[20] The exception to this is the assignment of cash flow activities on the week Ms. Salemi returned from FMLA leave. But, where Mr. Moore assigned Ms. Salemi cash flow activities *before* she took FMLA leave, a reasonable jury could not conclude that the continued assignment of these same activities was in retaliation for Ms. Salemi taking FMLA leave. *See Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1192 (10th Cir. 2016) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)) (noting that an employer "need not suspend previously planned adverse employment actions upon encountering an employee's protected activity").

46

between her return from FMLA leave and any loss of responsibilities.[21] Therefore, we affirm the district court's grant of summary judgment on Ms. Salemi's FMLA retaliation claim.

**B.** *Construction of Amended Complaint & Request to Add EPA Retaliation Claim*

**1. District Court's Construction of Amended Complaint**

Ms. Salemi argues that her amended complaint pleaded the elements of an EPA retaliation claim and put PERA on fair notice of her intent to raise such a claim. From this, Ms. Salemi argues the district court erred in denying her request to try an EPA retaliation claim.[22] But, in the district court, Ms. Salemi raised her argument that her amended complaint contained an EPA retaliation claim *after* the entry of the final pretrial order that did not identify an EPA retaliation claim to be submitted to the jury. Thus, presentation of an EPA retaliation claim to the jury would have necessitated an amendment to the final pretrial order, irrespective of whether the

---

[21] Ms. Salemi points us to no non-temporal proximity evidence linking the alleged adverse actions to her taking FMLA leave such that she could rely on a gap of three months combined with other evidence to establish a causal connection.

[22] Ms. Salemi fails to articulate a standard of review with respect to her argument that her amended complaint contained an EPA retaliation claim. As such, Ms. Salemi failed to comply with Federal Rule of Appellate Procedure 28(a)(8)(B), which states that the argument section of the brief must contain, "for each issue, a concise statement of the applicable standard of review . . . ." This omission is particularly troublesome where Ms. Salemi (1) failed to include a standard of review for several of her arguments on appeal; (2) failed to include a summary of the argument section as required by Federal Rule of Appellate Procedure 28(a)(7); and (3) came within 143 words of the word limit for opening briefs, as set by Federal Rule of Appellate Procedure 32(a)(7)(B). Inclusion of the required standard of reviews and the summary of the argument section would almost certainly have put Ms. Salemi over the word limit.

amended complaint asserted that claim. *See Monod v. Futura, Inc.*, 415 F.2d 1170, 1173 (10th Cir. 1969) (pretrial order "supersede[s]" the pleadings as to issues for trial). Because the final pretrial order "superseded" her amended complaint with respect to the claims and issues for trial, even if Ms. Salemi's amended complaint placed PERA on fair notice of her initial intent to bring an EPA retaliation claim, that would not have permitted Ms. Salemi to present such a claim to the jury after excluding it from the pretrial order. Accordingly, we need not resolve whether the amended complaint, in fact, adequately notified PERA that Ms. Salemi intended to bring an EPA retaliation claim.

## 2. Request to Add EPA Retaliation Claim

Both before and during trial, Ms. Salemi unsuccessfully sought permission to add an EPA retaliation claim. On appeal, Ms. Salemi argues the district court abused its discretion when it did not permit her to add an EPA retaliation claim under Federal Rule of Civil Procedure 15(b). As PERA points out, Rule 15(b) covers amendments to the complaint during and after trial, while Rule 15(a) covers amendments to the complaint before trial. Because Ms. Salemi does not present an argument on appeal relative to Rule 15(a), or even cite the Rule, she has not adequately contested the district court's decision not to allow the pretrial amendment, and we limit our review to the district court's denial of Ms. Salemi's request during trial. *See Bronson*, 500 F.3d at 1104.

Rule 15(b) permits a party to amend its complaint:

(1) *Based on an Objection at Trial*. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an

48

amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

(2) *For Issues Tried by Consent*. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move--at any time, even after judgment--to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

Relying on subsection (b)(2), Ms. Salemi argues that PERA implicitly consented to trial on an EPA retaliation claim by not objecting to (1) direct examination testimony by Ms. Salemi about retaliation for seeking equal pay and (2) testimony on cross examination by Mr. Moore and Ms. Setter about their conduct toward Ms. Salemi after she sought equal pay. Ms. Salemi also argues that PERA elicited testimony from Mr. Moore and Ms. Setter about not retaliating against Ms. Salemi.

Two procedural matters cause us to affirm the district court's decision to reject Ms. Salemi's request to submit an EPA retaliation claim to the jury. First, as noted earlier, the final pretrial order supersedes the complaint as to the issues to be presented at trial. *See Monod*, 415 F.2d at 1173; *see also* Fed. R. Civ. P. 16(d) ("*Pretrial Orders*. After any conference under this rule, the court should issue an order reciting the action taken. This order *controls the course of the action* unless the court modifies it." (emphasis added)). Here, the final pretrial order did not identify an EPA retaliation claim as one of the claims to be submitted to the jury. And, under Federal Rule of Civil Procedure 16(e), "[t]he court may modify the order issued after a final pretrial conference *only to prevent manifest injustice*." (emphasis added). But, Ms. Salemi neither moved to

49

amend the final pretrial order nor presented a manifest injustice argument to the district court when requesting that she be permitted to submit an EPA retaliation claim to the jury. Nor does Ms. Salemi present a manifest injustice argument under Rule 16(e) in her briefs on appeal. Accordingly, Ms. Salemi failed to make the proper motion in the district court and has not raised the necessary arguments in the district court or in this court in support of the amendment she desired.

Second, the record shows the district court twice questioned counsel for Ms. Salemi about whether some of the evidence offered at trial strayed into the issue of retaliation. In response, Ms. Salemi's counsel argued the exhibits were necessary for "context" and were part of the "res gestae" of the case. *Id.* at 1716, 1767. During the first exchange with the district court, counsel for Ms. Salemi also responded to the district court's concern by stating:

> Your Honor, my response to that would be that the other issues—we understand that with regard to the retaliation claim we cannot collect damages for that, and the jury will be properly instructed that we don't—that we are not getting any damages for that. The jury will be instructed what damages we are allowed to collect if we win, which will not include those. *And the jury will properly be instructed what the legal claims are, which will not include a retaliation claim.*

*Id.* at 1715–16 (emphasis added). And during the second exchange, PERA's counsel contended an exhibit "mentions expressly retaliation," *id.* at 1766, to which the district court agreed, and counsel for Ms. Salemi replied:

> And, Your Honor, and with regard to that, *we are not asserting a retaliation claim*, and the jury will be properly instructed that it's a claim under the Equal Pay Act for discrimination in pay. And obviously the verdict form will follow along that. So it's I think a little bit troubling to keep out the facts of what ended up happening in the case.

50

*We're not claiming retaliation as a stand-alone legal claim* at this point based on the Court's prior rulings, but it doesn't change the res gestae of what happened. So, you know, it's a little bit of an artificial constraint to not be allowed to use the word "retaliation" when, in fact, what happened is she is trying to rebut these assertions that she is not doing her job, and then she says, you know, I have been doing my job all along, I've gotten eight years of good performance reviews. *We are not trying to bring a stand-alone retaliation claim.* I understand that that boat has sailed with the Court's prior rulings. But she's still, I think, entitled to provide a description of why she's rebutting the articulated deficiencies in her performance.

*Id.* at 1767–68 (emphasis added).

Given Ms. Salemi's counsel's statements at trial that presentation of evidence which might tend to show retaliation would not be grounds for presenting an EPA retaliation claim to the jury, Ms. Salemi cannot now argue on appeal that PERA consented to trial on an EPA retaliation claim by permitting the admission of this very evidence. Accordingly, the district court did not abuse its discretion when it rejected Ms. Salemi's mid-trial request to submit an EPA retaliation claim to the jury.

## III.   CONCLUSION

**AFFIRMED**.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

51